**UNITED STATES DISTRICT COURT**
**FOR THE**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **STATE OF LOUISIANA**<br><br>**PLAINTIFF**<br><br>**VERSUS**<br><br>**EXPRESS SCRIPTS, INC. and ASCENT HEALTH SERVICE, LLC**<br><br>**DEFENDANTS** | **CIVIL ACTION NO: 2:26-cv-1912**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

**NOW INTO COURT,** through undersigned counsel, comes the State of Louisiana, through the Honorable Elizabeth B. Murrill, Attorney General for the State of Louisiana, and respectfully submits the following:

## I. INTRODUCTION

1. Americans spend more on prescription drugs than any other country. In the United States, prescription drug prices are more than double the cost of identical drugs in other high-income countries.[1] Patient out-of-pocket costs reached a record $110 billion in 2025 alone.[2] While the costs of prescription drugs skyrocket, roughly a third of American adults report difficulty paying for their prescriptions, with many delaying treatment, skipping doses, or foregoing

[1] Mulcahy, Andrew et al, *International Prescription Drug Prices Comparisons: Estimates Using 2022 Data,* *24 (RAND Corp. February 1, 2024), https://www.rand.org/pubs/research_reports/RRA788-3.html.
[2] IQVIA Inst. For Human Data Science, *U.S. Medicine Use Trends 2026,* (April 28, 2026), online at https://www.iqvia.com/insights/the-iqvia-institute/reports-and-publications/reports/us-medicine-use-trends-2026.

treatment altogether.[3] In fact, medication non-adherence is said to account for an estimated 100,000 preventable deaths and $100 billion preventable medical costs each year.[4]

2. Louisiana is no different. In a recent survey of more than 1,400 Louisiana adults, approximately 36% reported cutting pills in half, skipping doses of medicine, or even not filling a prescription due to cost.[5] A large percentage further reported going without care, rationing medication, and in some instances, even being forced to choose between prescriptions because they "could not afford them all" or because they needed "to pay other bills over the price of medications."[6]

3. The prescription drug affordability crisis in this country is due in large part to the gatekeeping role played by pharmacy benefit managers ("PBMs") in the prescription drug supply chain.[7] PBMs serve as middlemen between drug manufacturers, pharmacies, and insurance companies, negotiating pricing, reimbursement rates, and access to prescription drugs for hundreds of millions of Americans.[8] PBMs design drug formularies that dictate what drugs are covered by Health Benefit Plans ("Plans")[9] and how much individuals covered by those Plans (sometimes

---

[3] Edwards, Matthew, *The Drug Pricing Machine and Why Patients Keep Paying More,* International Business Times (June 16, 2026) online at https://www.ibtimes.com/drug-pricing-machine-why-patients-keep-paying-more-3804191.

[4] Kleinsinger, Fred, *The Unmet Challenge of Medication Nonadherence,* National Library of Medicine (July 5, 2018), online at The Unmet Challenge of Medication Nonadherence - PMC.

[5] Healthcare Value Hub, 2023 Louisiana Consumer Health Survey, online at Louisiana – Healthcare Value Hub.

[6] *Id.*at Table 4. Specifically, 47% of adults between the ages of 18-24 reported rationing medication, compared to 34% of those ages 25-34, and 48 % of those ages 35- 44.

[7] *See* Fed. Trade Comm'n Off. of Pol'y Plan., Interim Staff Report, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs & Squeezing Main Street Pharmacies* *2-3 (2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf ("FTC Report").

[8] *Id.* at *1. *See also,* Martin, Kristi, *What Pharmacy Benefit Managers Do and How They Contribute to Drug Spending,* The Commonwealth Fund (March 17, 2025), online at https://www.commonwealthfund.org/publications/explainer/2025/mar/what-pharmacy-benefit-managers-do-how-they-contribute-drug-spending.

[9] For purposes of this Complaint, a "Health Benefit Plan" refers to any entity or arrangement that provides, administers, manages, pays for, reimburses, or otherwise facilitates health care for Covered Individuals that includes pharmacy services and prescription drug benefits, including, but not limited to health insurers, managed care organizations, employer-sponsored health plans, governmental health benefit programs.

referred to herein as "Covered Individuals," "patients," or "consumers"[10] are required to pay out of pocket; handle price and rebate negotiations with pharmacies and drug manufacturers; and create networks of retail pharmacies which determine where and how Covered Individuals can get their prescriptions filled (referred to as "Pharmacy Networks").[11] As a result, PBMs wield significant power and control over patients' access to drugs and the prices they pay.

4. Over the past decade, the PBM industry has become increasingly concentrated. In 2025, just three PBMs – Defendant Express Scripts, Inc., Caremark, and Optum Rx ("the Big Three") – were responsible for processing nearly 80% of all prescription drug claims.[12] The next three largest PBMs, including Prime, control the bulk of the rest.[13] All of the top six PBMs are now vertically integrated or affiliated with the nation's largest health insurers and specialty and retail pharmacies.[14] This ever-increasing concentration of the PBM market has allowed PBMs to coordinate and control pricing and other activities with competitors.

5. To add even more complexity and opacity to the market, PBMs aggregate their market power in a number of different ways. Large PBMs, including Defendant Express Scripts, contract with smaller PBMs to increase their leverage when negotiating manufacturer rebates or contract terms with pharmacies and expand their ability to steer prescriptions to wholly owned or affiliated specialty or mail-order pharmacies. PBMs also use group purchasing organizations

[10] Plans may use different terms such as members, beneficiaries, subscribers, participants, insureds, enrollees, covered lives, or some other designation to describe individuals receiving benefits under their Plan. For purposes of this Complaint, all such persons will be referred to as "Covered Individuals," regardless of terminology used by a particular Plan.

[11] *See,* Ginder-Vogel, Katie, *The Evolution and Future of Pharmacy Benefit Managers,* University of Wisconsin-Madison School of Pharmacy (March 13, 2024), online at https://pharmacy.wisc.edu/2024/03/13/the-evolution-and-future-of-pharmacy-benefits-managers.

[12] Fein, Adam J., *Top Pharmacy Benefit Managers of 2025: Market Share and Key Industry Developments,* Drug Channels (March 30, 2026), online at Drug Channels: The Top Pharmacy Benefit Managers of 2025: Market Share and Key Industry Developments ("Top PBMs 2025").

[13] *Id*. Specifically, Humana, MedImpact, and Prime control 7%, 5%, and 3% of the market, respectively.

[14] FTC Report, supra note 7, pg.13 (discussing how the smaller PBMs contract with the larger PBMs for various PBM services, including for claims processing and prescription fulfillment services as well as manufacturer rebate negotiations).

("GPOs") – entities often owned or affiliated with the PBMs – to negotiate rebates and discounts from drug manufacturers on behalf of one or more PBMs.[15]

6. One of the most powerful ways that PBMs control the market and contribute to the rising drug costs is through their control of formularies – lists of drugs covered by Plans. Manufacturers need their drugs included on formularies, and therefore PBMs can use this leverage to demand high fees, rebates, payments, and other remuneration from the manufacturers under the threat of formulary exclusion. These payments and other financial benefits may go by different names, yet, however they are described, these payments are the *quid pro quo* for formulary inclusion. To make up for compensating the PBMs, manufacturers often increase the list price of their drugs. Instead of passing through these payments to patients to lower drug prices, the PBMs retain significant amounts as profit for themselves.

7. PBMs further increase costs by manipulating formularies to prefer or only include more expensive brand name drugs over less expensive generic versions. To make matters worse, PBMs often require that patients fill prescriptions at their own in-house or specialty pharmacies and then restrict patients' access to the most expensive drugs. This not only drives up the costs of drugs but also dictates patient care, and it means that Plans are overcharged compared to the price that the Plans would pay at other non-PBM owned pharmacies.

8. PBMs also use their market power to hurt competing pharmacies, particularly independent pharmacies.[16] In order to stay in Pharmacy Networks, independent pharmacies are often forced to accept drug reimbursement rates significantly below what the pharmacies pay for those drugs and their overhead costs. PBM practices further incentivize steering prescriptions –

[15] *Id.* at *21-22.
[16] As used herein, "independent pharmacies" refers to non-PBM affiliated pharmacies operating in Louisiana and elsewhere.

and diverting funds – to pharmacies that PBMs wholly own or with which they are affiliated. As a result, many of Louisiana's independent pharmacies struggle to stay in business or are forced to close altogether. The loss of independent pharmacies, especially those in rural or under-served areas, poses a significant public health crisis in already marginalized communities.[17]

9. Because of the nature of the market, pharmacies and drug manufacturers have little choice but to interact with—and acquiesce to—the terms of the large, dominant PBMs when purchasing or distributing prescription drugs. This system allows PBMs to manipulate drug price competition for their own benefit.[18] Rather than controlling costs, the opposite has occurred: Plans and consumers are seeing significantly higher costs with fewer choices and worse care.[19]

10. The State brings this complaint against Express Scripts, Inc., the largest PBM in the United States[20] and its GPO Ascent Health Services (hereinafter, collectively, "Defendants"), to address violations of state and federal law that have significantly contributed to the high price of pharmaceuticals in the United States. As detailed herein, Defendants have engaged in anticompetitive conduct and deceptive practices that have raised drug prices and effectively eliminated competition, all while Defendants extract illegal profits from the marketplace to the detriment of the State of Louisiana, its residents, independent pharmacies, and its general economy.

## II. NATURE OF THE ACTION

11. This is a civil action brought by the State of Louisiana on behalf of the citizens of Louisiana against Express Scripts, Inc. and Ascent Health Services, LLC, to enforce public rights

---

[17] Berenbrok, Lucas, *Why pharmacies are closing – and what to do if yours shuts its doors,* Louisiana First News (February 23, 2025), online at https://www.louisianafirstnews.com/news/national-news/why-pharmacies-are-closing-and-what-to-do-if-yours-shuts-its-doors/.
[18] Complaint by the United States Federal Trade Commission in *In the Matter of Caremark, Rx, LLC et al.,* Docket No. 943*,* (September 20, 2024).
[19] Majority Staff of the House Committee on Oversight and Accountability, *The Role of Pharmacy Benefit Managers in Prescription Drug Markets*, H. Comm. Oversight and Accountability, (Jul. 23, 2024)., p. 27, online at https://oversight.house.gov/report/pbm-report/ ("House Report").
[20] Top PBMs 2025, supra note 10.

and protect residents and its general economy against violations of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) ("Sherman Act"), Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26), the Louisiana Unfair Trade Practices Act (LSA-R.S. 51:1401 *et seq*.) ("LUTPA"), and the Louisiana Monopolies Act (LSA- R.S. 51:121 *et seq*.

12. For approximately 71% of Louisianians covered by commercial insurance, Express Scripts, the largest PBM in the United States, controls which drugs will be covered, what portion of the price of those drugs will be covered, as well as how much reimbursement pharmacies that fill those prescriptions will collect.

13. This Complaint details how Express Scripts entered into a combination, contract, or conspiracy with Prime Therapeutics, LLC – its direct horizontal competitor and ostensible rival – to unlawfully expand its market power and eliminate competition. Pursuant to this unlawful agreement (hereinafter, "Express Scripts-Prime Agreement" or "Agreement"), Express Scripts and Prime shared drug pricing information to extort larger rebates from drug manufacturers, while simultaneously lowering and aligning reimbursement rates paid to independent pharmacies.

14. Express Scripts, in marketing its PBM services, promises to deliver cost savings to health insurers, employers, employee benefit plans, governmental entities, and consumers. As further described herein, however, Express Scripts' business model reveals that promise is knowingly false. This Complaint further outlines how Express Scripts, armed with increased market power, imposed and maintained a drug pricing and distribution system that for years has increased, rather than decreased, the costs of prescription drugs in Louisiana.

15. Finally, this Complaint explains how Express Scripts engaged in conduct designed to harm independent pharmacies and further restrict competition by collecting large fees while offering reimbursement rates below the acquisition costs. Express Scripts also steers patients to its

owned or affiliated pharmacies. As a result, many independent pharmacies in Louisiana struggle to stay in business.

16. Though Defendants generate billions in profits from increased list prices and additional fees. Plans and patients have limited visibility into whether and to what extent any savings generated by PBM pricing strategies are passed through to them versus retained by the PBM. This is because Defendants disguise and conceal their profits through hidden contracts and other deceptive practices.

17. The State of Louisiana seeks (1) damages, trebled, for its injuries and those suffered by the State, citizens and businesses of Louisiana; (2) to enjoin Defendants' wrongful conduct; (3) civil penalties; (4) attorney's fees; and (5) for other such relief as afforded under the laws of the United States and the State of Louisiana.

## III. <u>PARTIES</u>

18. Plaintiff, the State of Louisiana ("State") is a sovereign state that fulfills its duties to its citizens through various departments, agencies, and offices as established by law. Pursuant to Louisiana Constitution Article IV, Section 8, the Attorney General is the chief legal officer of the State of Louisiana. The Attorney General has authority under federal and state law to bring any civil action or proceeding necessary for the assertion or protection of any right or interest of the State or its citizens.[21]

19. Defendant Express Scripts, Inc., formerly known as Express Scripts Holding Company ("Express Scripts"), is a corporation organized under the laws of Delaware with its principal place of business in St. Louis, Missouri. Express Scripts is a wholly owned subsidiary of Evernorth Health, Inc., which is a wholly owned subsidiary of Cigna Group ("Cigna"), an

[21] La. Const. art. IV, § 8. *See also, Alfred L. Snapp & Son v. P.R.*, 458 U.S. 592, *601, 607 (1982).

international health services corporation with a total revenue of $275 billion in 2025.[22] Express Scripts is the largest PBM in the United States.[23] As of 2022, Express Scripts held approximately 71% of the market[24] in Louisiana. Express Scripts is also the PBM for Louisiana Healthcare Connections, a managed care organization ("MCO") that administers the State's Medicaid Program and that held 33% of the market in 2024.[25] At various times during the relevant time period, Express Scripts served as a PBM for other State Medicaid managed care organizations as well as a third-party administrator for the Louisiana Office of Group Benefits.

20. Defendant Ascent Health Services, LLC ("Ascent") is a limited liability company organized under the laws of Delaware with its principal place of business in Schaffhausen, Switzerland. In 2019, Cigna established Ascent as a GPO for the negotiation of rebates with drug manufacturers on behalf of PBMs.[26] Ascent's ownership includes, among others, both Defendant Express Scripts and its co-conspirator, Prime Therapeutics, LLC.

## IV. RELEVANT ENTITIES AND PROGRAMS

21. Co-Conspirator Prime Therapeutics, LLC, ("Prime") is a corporation organized under the laws of Delaware with its principal place of business located in Egan, Minnesota. Prime provides PBM services to, among others, commercial health plans, self-insured employers, and government programs in the State of Louisiana. Prime is owned jointly by numerous Blue Cross and Blue Shield Plans, subsidiaries or affiliates, including, on information and belief, Louisiana

---

[22] Cigna Corp., Annual Report, p. 8 (2025), online at 2025-Annual-Report.pdf.
[23] Top PBMs 2025, supra note 10.
[24] *See* Matej Mikulic, *Market Share of the Largest Pharmacy Benefit Manager by U.S. State 2022*, Statista (May 31, 2023), online at Largest PBM in every US state by market share 2022| Statista.
[25] *New PBMs for Louisiana Medicaid Health Plans effective October 1, 2025,* Louisiana Department of Health, online at PBM_TransitionJointNotice.pdf.
[26] *Group Purchasing Organizations and Ascent,* Evernorth Health Services, at Group Purchasing Organizations and Ascent | Evernorth (last visited June 23, 2026).

Health Services Indemnity, Inc. d.b.a. "Blue Cross Blue Shield of Louisiana" ("BCBS-LA").[27] In 2025, Prime held approximately 3% of the national PBM market.[28] For approximately two years, ending on October 1, 2025, Prime was the sole PBM for the Louisiana Medicaid Program.[29] Historically, Express Scripts also acted as the PBM for other MCOs administering the State's Medicaid Program.

22. The Louisiana Medicaid Program is a state-administered program with federal matching funds that pays for medical care for Louisiana's low-income and disabled citizens. As a result of Defendants' unlawful conduct described herein, the Louisiana Medicaid Program has incurred and will continue to incur significant overcharges for prescription drugs.

23. The Louisiana Office of Group Benefits is an agency of the State of Louisiana that provides health benefits, including prescription drug coverage, to both active and retired state employees. As a result of Defendants' unlawful conduct described herein, the Office of Group Benefits has incurred and may continue to incur significant overcharges for prescription drugs.

## V. JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

25. In addition to pleading violations of federal law, the Louisiana Attorney General alleges violations of Louisiana state law, as set forth herein, and seeks civil penalties, damages, and equitable relief under those state laws. This Court also has supplemental jurisdiction over the

[27] Prime Therapeutics, *About Prime*, online at https://www.myprime.com/en/about-prime.html (last visited June 30, 2026).
[28] Guardado, Jose R., *Competition in PBM Markets and Vertical Integration of Insurers with PBMs: 2025 Update.* American Medical Association (2025), online at https://www.ama-assn.org/system/files/prp-pbm-shares-hhi-2025.pdf.
[29] *New PBMs for Louisiana Medicaid Health Plans effective October 1, 2025*, Louisiana Department of Health (2025), online at PBM_TransitionJointNotice.pdf.

state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and are based on a common nucleus of operative fact.

26. This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Antitrust Act (15 U.S.C. § 22).

27. Venue is proper in this Court pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and under the federal venue statute, 28 U.S.C. § 1391, because certain unlawful acts by Defendants were performed in this District, including the fixing of reimbursement rates paid to pharmacies in this District, and those and other unlawful acts caused harm to interstate commerce in this District.

28. Defendants, directly or through their divisions, subsidiaries, predecessors, agents or affiliates, may be found in and transact business in this State, including through the provision of PBM services offered by Plans that operate in and provide benefits to Covered Individuals who reside in this District, and through the adjudication of reimbursement claims to pharmacies that are located in this District.

29. Defendants, directly or through their divisions, subsidiaries, predecessors, agents or affiliates, have engaged or are engaging in anticompetitive and illegal conduct that has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. The acts complained of herein have, and will continue to have, substantial effects in this District.

30. Defendants, directly or through their divisions, subsidiaries, predecessors, agents or affiliates, engage in interstate commerce, including in the provision of PBM services, such as pharmacy network maintenance and rebate contracting with drug manufacturers.

# VI. BACKGROUND

## A. The Role of PBMs in the Pharmaceutical Supply Chain

31. In the United States, the prescription drug industry consists of an opaque network of entities engaged in multiple distribution and payment structures. These entities include, among others, drug manufacturers, wholesalers, pharmacies, Plans, third-party administrators, third-party payors, pharmacy benefit managers, consultants, and patients.

32. Generally speaking, prescription drugs are distributed from manufacturer to wholesaler, wholesaler to pharmacy, and pharmacy to patient.

33. PBMs act as powerful yet obscure middlemen that influence pricing, access, and reimbursement rates across nearly every stage of the prescription drug supply chain and, most importantly, in virtually every financial transaction that occurs when a drug is dispensed.

34. Formed in the late 1960s, PBMs were originally created to help insurers control prescription drug spending and manage benefits.[30] Throughout the 1970s and 1980s, PBMs performed this function primarily by processing or adjudicating claims[31] filled by pharmacies and reimbursed by Plans. Overtime, PBMs began to fill additional roles, including handling price negotiations with drug manufacturers on behalf of Plans.

35. Today's PBMs, however, contract with – and sometimes share ownership with – drug manufacturers, wholesalers, pharmacies, health insurers, and MCOs to provide a variety of different services for Plans that are established, maintained, and funded by Plan Sponsors. Plan Sponsors may include, among others, employers, unions, employee-benefit funds, government

---

[30] *What are pharmacy benefit managers and why we need reform?,* The American Medical Association (February 4, 2026), online at https://www.ama-assn.org/health-care-advocacy/access-care/what-are-pharmacy-benefit-managers-pbms-and-why-we-need-reform.

[31] Claims adjudication is the process by with PBMs determine (1) whether an individual has prescription-drug benefits; (2) whether the drug in question is covered by the patient's Plan; (3) the total reimbursement rate to be paid to the pharmacy based on existing network agreements; and (4) the amount of money the pharmacy is to collect directly from the consumer.

health programs, health insurers, and other organizations that provide or pay for prescription drug coverage and pharmacy services for Covered Individuals.[32] The mix of PBM services provided under such contracts or relationships varies by PBM and Plan Sponsor, but common services include: (1) designing drug formularies which dictate what drugs are covered by the Plan and how much Covered Individuals are required to pay out of pocket; (2) handling price and rebate negotiations with pharmacies and drug manufacturers; and (3) creating and maintaining networks of retail pharmacies at which Covered Individuals can fill their prescriptions ("pharmacy networks").[33]

36. To provide these services, PBMs interface with all parties involved in the parts pharmaceutical supply chain, as illustrated below.

**The U.S. Pharmacy Distribution and Reimbursement System**




[32] This Complaint
[33] *What are pharmacy benefit managers and why we need reform?,* The American Medical Association (February 4, 2026), online at https://www.ama-assn.org/health-care-advocacy/access-care/what-are-pharmacy-benefit-managers-pbms-and-why-we-need-reform.

**B. <u>Overview of PBM Services</u>**

***PBMs create and maintain Drug Formularies***

37. PBMs design and maintain drug formularies – lists of drugs that are covered by insurance – for Plan Sponsors. PBMs determine what drugs are covered, as well as those that are not. They also assign covered drugs to formulary "tiers," which determine the patient's co-pay or co-insurance requirements and clinical criteria. When a drug is slotted into a preferred tier, the Plan covers a relatively high share of the cost; when a drug is slotted into a less preferred tier, prescribers must first obtain prior authorization based on clinical criteria and typically the patient must shoulder more of the cost.[34]

38. Formulary placement decisions by PBMs can have powerful implications across many levels of the healthcare industry. In a report dated July 23, 2024, the House Committee on Oversight and Accountability ("House Report") recognized that if a specific drug is "included on a formulary, especially in a lower tier . . . many more people will have access to [that] drug at lower costs."[35]

39. In return for these services, PBMs receive not only administrative fees, but they retain certain portions of the payments or other valuable consideration made through other contractual relationships, including those with drug manufacturers and retail and/or independent pharmacies.

***PBMs Negotiate Rebates and Discounts with Drug Manufacturers***

40. Another service PBMs agree to provide pursuant to their contracts with Plan Sponsors is the negotiation of rebates and other price concessions with drug manufacturers.

---

[34] The most preferred Tier is typically labeled as Tier 1, with the less preferred drugs falling into "higher" tier categories such as Tier 2 through Tier 5. This "higher" (non-preferred) vs. "lower" (preferred) language is reflected in the House Reports referenced herein.

[35] House Report, supra note 15.

Generally, manufacturers pay these amounts to the PBM or an affiliated rebate-aggregation entity. Typically, the PBM's contract with the Plan Sponsor then governs whether those amounts must be disclosed, passed through, or whether the PBM or its affiliates may retain any portion, including the amount collected in excess of any contractual rebate guarantees.

41. One type of rebate that PBMs commonly negotiate are discounts in the form of a refund of a portion of the purchase price paid for the drug after it is dispensed to a Covered Individual (often referred to as "rebates" or "discounts"). They are commonly calculated as a percentage discount off of the manufacturer's price for a given drug as reported in wholesale price guides or similar industry publications, which is often referred to as the wholesale acquisition cost or "WAC," or simply as the manufacturer's list price (hereinafter, "List Price").

42. Congressional investigations confirm the existence of a "clear financial incentive" on the part of drug manufacturers to "secure access" to drug formularies, "especially in a lower tier."[36] Manufacturers are willing to offer these rebates in exchange for inclusion of that manufacturer's product on the PBM's formulary and may stack these with other types of rebates based on List Price or other calculation methodologies. Either as a stand-alone or additional rebate stacked on top of formulary rebates, a PBM may, for example, negotiate a "market-share rebate." Market-share rebates are payments often tethered to a drug's List Price that reward the PBM for increasing the volume or dollars attributable to a manufacturer's drug that results in driving up drug sales, thus increasing their market share and ultimately, the profitability of both the manufacturers and the PBMs. Because the placement of a drug on a PBM's preferred formulary tier substantially increases drug sales, manufacturers often offer larger rebates for favorable tier placement since it ultimately increases market share. Other rebate types include those that are

[36] *Id.*

based on satisfying contractual performance measures such as utilization or other metrics, price-protection or inflation rebates, administrative fees, and data or data-sharing related payments. In theory, rebates and other price concessions that PBMs receive from manufacturers are supposed to reduce costs for Plans and Covered Individuals. This is not the case in practice. In reality, rebates incentivize manufacturers to simply raise their List Prices. This may result in consumers paying higher out-of-pocket costs since their deductibles or coinsurance are calculated using the List Price, especially when rebates are not applied at the point-of-sale. In addition, PBMs do not always pass on the negotiated rebates in full to the Plan. While a portion of the rebate may be passed through to the Plan, some percentage is often retained by the PBMs with little to no transparency. As such, PBMs have the opportunity to take the lion's share of the financial rewards from the rebates.

43. The amount of any rebates is often outlined in contracts between the PBM and the drug manufacturers, while the portion of the rebates that may be retained by the PBM is typically spelled out in contracts between the PBM and the Plan Sponsor. These contracts are confidential, and, under their terms, kept secret from the other entities contracting with the PBM.

***PBMs determine and control Pharmacy Networks***

44. PBMs also contract with pharmacies as part of their contractual obligation to their Plans. A PBM pharmacy network is a group of pharmacies that have agreed to fill prescriptions for Covered Individuals of certain Plans administered by the PBM. A PBM may maintain several different networks, and a pharmacy may participate in one or more PBM networks. PBMs, due to their market power, often dictate these terms, including reimbursement amounts and related fees, in what pharmacies describe as "take it or leave it" type contracts. The purpose of a PBM pharmacy

network is to ensure that Covered Individuals have ready and affordable access to prescription drugs.

45. To access and serve patients whose benefits are managed by a particular PBM, a pharmacy must enter into a contract with the PBM and agree to participate in one or more of the PBM's networks. Network contracts dictate which pharmacy a Covered Individual is permitted to use, how much the PBM must reimburse the pharmacy for prescription drugs and related services, and what fees the pharmacy must pay to the PBM to participate in its networks, among other conditions.

46. Typically, non-affiliated retail pharmacies that belong to a PBM's network agree to offer steep discounts off certain pricing benchmarks[37] to PBMs (and the Plans they represent) in exchange for participation in the PBM's network (and the increased business such participation brings). These discounts are frequently realized in annual or quarterly "reconciliations" in which the PBM calculates the financial performance to the effective rate based upon the submitted claims information over the time period and either recoups additional funds or uses the reconciliation process to offset future payments. Just as with manufacturer rebates, PBMs do not always pass on the full extent of negotiated pharmacy discounts to their clients, instead keeping as profit the difference between (a) what they pay the pharmacy and (b) what they collect from the Plan for each drug. This is known as "spread" pricing or spread retention.

47. The terms contained in these agreements are often the result of a closed-door contracting process between pharmacies and PBMs; they are confidential and considered competitively sensitive and not disclosed to Plan Sponsors.

[37] Prescription drugs do not have a single, fixed retail price like a gallon of milk at the grocery store. Instead, pricing is sourced from "pricing benchmarks" from either the pharmacy-reported cash charges, published reference prices, acquisition cost surveys, or PBM or payor established reimbursement ceilings.

48. PBMs' increasing market power has enabled them to impose onerous pricing terms on unaffiliated pharmacies as a condition of network participation, which has pushed many retail pharmacies to close their doors, and many more to the brink of collapse, harming patients, Plans, and local economies.

49. PBMs that are vertically integrated with pharmacies, including Express Scripts, are financially incentivized to steer patients to their own affiliated pharmacies, even if an unaffiliated rival pharmacy may offer Plans and Covered Individuals the same drugs at a better price.

50. PBMs steer patients to their affiliated pharmacies in a number of ways. PBMs can create narrow and preferred Pharmacy Networks consisting of their vertically integrated pharmacies. PBMs use preferred Pharmacy Networks to encourage patients to visit certain locations by offering lower cost-sharing or out-of-pocket costs. The relatively low co-pay requirements collected by PBM-affiliated preferred pharmacies are designed to attract patient traffic even if unaffiliated, competing pharmacies offer lower prices to those same patients' Plans.

51. PBMs can also diminish competition against their affiliated pharmacies by simply removing non-affiliated pharmacies from their networks all together or by making it difficult for pharmacies to participate in their networks in the first place. PBMs may subject pharmacies to long wait periods prior to network admission or require that they post excessive bonds. A pharmacy without access to a major PBM's covered lives will likely go out of business. Thus, a key factor contributing to the higher risk of closure for independent pharmacies is the frequent exclusion from its networks.

## C. Drug Pricing

52. The pharmaceutical industry is unique in that the pricing chain is distinct from the payment and distribution chain. The prices for the drugs distributed in the pharmaceutical chain

are different for each participating entity: different players pay different prices set by different entities for the same drugs.

53. Generally, PBMs pay pharmacies dispensing prescription medications in Louisiana a dispensing fee plus a patient copay amount (if any) plus the drug's ingredient cost, which is typically based on a formula involving pricing benchmarks from various sources, as well as a state mandated provider fee.

54. Ingredient costs are set using benchmarks that vary at each stage in the drug manufacturing, acquisition, dispensing process, and rebate calculations, including, but not limited to, the following:[38]

- **Wholesale Acquisition Cost ("WAC"):** the manufacturer's published price to wholesalers or direct purchasers, excluding rebates or other discounts, which is, as noted above, commonly also referred to as the List Price.[39]

- **Average Wholesale Price ("AWP")**: the estimated average price that pharmacies pay to wholesalers (excluding rebates and other discounts).

- **National Average Drug Acquisition Cost ("NADAC")**: the estimated wholesale price retail pharmacies pay to wholesalers, based on invoice prices paid by retailers.

- **Maximum Allowable Cost ("MAC"):** a PBM-or-payor established upper limit or ceiling for certain generic drugs.

- **Usual and Customary Price ("U&C" or "cash price"):** the price that a pharmacy charges cash-paying consumers.

55. Using benchmarks such as WAC, AWP, MAC, and others, market players negotiate the various contractual costs, prices and reimbursements, and rebates paid at each stage within the

[38] Hung, Anna, *A primer on prescription drug pricing benchmarks in the United Staes,* Journal of Managed Care & Specialty Pharmacy, Volume 31, Number 12 (November 26, 2025), online at https://doi.org/10.18553/jmcp.2025.31.12.1326. *See also, Understanding Drug Reimbursement in Pharmacy,* online at https://healthtrustpg.com/thesource/ihp-pharmacy/understanding-drug-reimbursement-in-pharmacy/ (last visited June 30, 2026).

[39] Industry players also sometimes refer to "List Price" more generically, which contributes to confusion for entities who seek to contract, negotiate, audit or understand industry pricing.

pharmaceutical supply and distribution process. The complexity and variability of the pricing structures make it challenging for the pharmacies and the Plans to calculate the amounts owed as a prescription drug flows through each point of the transaction.

56. PBMs exploit this complexity. Through their contractual relationships with various entities, PBMs negotiate the formulas that will be used to calculate each stage of payment, while simultaneously acting as middlemen through whom each payment flows. Further, PBMs maintain that the terms of these contracts are confidential. Therefore, the formulas used to calculate one side of the payment/cost equation are unknown to the parties operating on the other side of the equation, allowing PBMs to retain excess profits for themselves.

**D. <u>PBM Market Concentration</u>**

57. As illustrated below, the Big Three PBMs, together with the next three largest PBMs – Humana Pharmacy Solutions, MedImpact, and Prime– manage roughly 95 percent of prescription drug claims in the United States.[40]

**PBM Market Share**




---

[40] Top PBMs, supra note 10.

58. PBM vertical integration, or the consolidation of health insurers, PBMs, pharmacies, and other entities under a single corporate parent, has significantly transformed the market for prescription drugs, leading to shifts in competitive balance, pricing, and accessibility of services.[41] As illustrated below, all of the top 6 PBMs are vertically integrated with health insurance companies, specialty pharmacies, and in some cases, even drug manufacturers and wholesalers.

**PBM Vertical Business Relationships[42]**




---

[41] SmithRx, *Unraveling PBM Complexity: The Consequences of Vertical Integration* (March 28, 2024), online at https://smithrx.com/blog/unraveling-pbm-complexity-the-consequences-of-vertical-integration

[42] Fein, Adam. *Mapping the Vertical Integration of Insurers, PBMs, GPOs, Specialty Pharmacies, and Healthcare Services: DCI's 2026 Update,* Drug Channels Institute (April 14, 2026), online at https://www.drugchannels.net/2026/04/mapping-vertical-integration-of.html

59. The interconnections between various entities not only explain how the drugs flow through the market, but more importantly, where profits accumulate.[43] Due to vertical integration, entities can internally allocate costs and revenues among different divisions, which obscures the true cost and value of services. Vertical integration also creates increased market power, allowing PBMs and their parent companies, subsidiaries, and affiliates to exert significant control over pricing.[44]

60. According to the FTC, vertical integration incentivizes PBMs to prefer their own affiliated businesses, which in turn disadvantages unaffiliated pharmacies and increases prescription drug costs.[45] For example, PBMs that are vertically integrated with pharmacies, including Express Scripts, are financially incentivized to steer patients to their own affiliated pharmacies, even if an unaffiliated rival pharmacy may offer Plans and their Covered Individuals the same drugs at a better price.[46]

61. This lack of competition and oversight leads to inflated drug prices by allowing vertically integrated entities to manipulate costs at each stage to maximize their own profits. Consumers and Plan Sponsors face higher medication costs and lack of transparency in pricing, yet they are left without viable alternatives.

62. Large PBMs, including Express Scripts, operate as "aggregators" of market power through their strategic partnerships or agreements with other PBMs – such as the above-referenced Express Scripts-Prime Agreement.[47] The Express Scripts-Prime Agreement — which is little more than a horizontal price-fixing agreement — allows Prime to increase their buying and negotiating

[43] SmithRx, supra note 32.
[44] *Id.*
[45] FTC Report, supra note 7.
[46] *Id.*
[47] Top PBMs, supra note 10.

power.[48] Defendants and Prime leverage their increased, combined market power to compel independent pharmacies to accept below-cost reimbursement amounts, and to coerce drug manufacturers to offer more distortionary discounts than they would in a competitive market.

63. In recent years, the largest PBMs, including Express Scripts, have created and used GPOs as other "rebate aggregators." GPOs are entities used by PBMs to negotiate contracts, including rebates, with drug manufacturers – a task that PBMs historically engaged in directly. GPOs, like Defendant Ascent, are usually subsidiaries of PBMs, formed as a result of internal restructuring of PBM functions due largely to shifts in the legal and regulatory landscapes, not as an expansion into a new segment of the pharmaceutical chain.

64. PBMs like Express Scripts and Prime contend that rebate aggregator entities like Ascent provide the PBMs and other clients with greater bargaining leverage by "aggregat[ing] purchasing volume to negotiate greater savings from pharmaceutical manufacturers."[49] In theory, the PBM-owned GPOs like Ascent aggregate Covered Individuals and prescription volume across multiple Plans for negotiating rebates, discounts, and other price concessions often in exchange for favorable formulary placement or access. GPOs also collect administrative, data, or other fees from manufacturers.

65. However, industry experts and members of Congress who have participated in hearings relating to PBM business practices suggest that the reason that PBMs created GPOs as separate entities was to retain revenue from incremental fee structures by shifting manufacturer compensation from amounts classified as rebates to separately classified fees that may be subject to different disclosure and pass through requirements.[50]

---

[48] *Id.*
[49] FTC Report, supra note 7.
[50] *Id.* at p. *22.

66. As a result of shifting rebate responsibility to GPOs and reclassifying rebates to fees, this may reduce the amounts manufacturers are willing to offer as rebates—which are increasingly subject to pass-through requirements by legislation, regulatory, or contract terms—and the PBM enterprise may be retaining more manufacturer-derived revenue as fees while passing through a smaller amount classified as rebates.

67. This creates the illusion that GPOs reduce drug prices to the extent that passed-through rebates are represented to be the entire savings. But if the PBM-enterprise collects and retains any additional fees collected by GPOs not passed through to or disclosed to the Plan or consumer, those savings are not realized by the Plan or the consumer and only benefit the PBM-enterprise. This lack of transparency further harms the Plan by obscuring the full costs and revenues associated with the PBM's services, making it difficult to assess whether the PBM is actually reducing the Plan's net prescription drug costs. Moreover, these restructured fees imposed on manufacturers by GPOs incentivize the manufacturers to further increase pre-rebate drug prices, thus artificially inflating the price of prescription medications, including the patient's co-pay or co-insurance obligations.

## VII. FACTUAL ALLEGATIONS

68. The allegations contained in Paragraphs 29-65 are incorporated by reference as though fully set forth herein.

### A. Express Scripts occupies tremendous control of the market in Louisiana.

69. Over the past two decades Express Scripts has contributed significantly to the rampant consolidation of the PBM industry. Since it began its operations in 1986, Express Scripts consummated multiple mergers and acquisitions of rival PBMs, beginning with its notable $29.1

billion merger with the PBM Medco Health Solutions announced in July 2011.[51] At the time of the merger in his testimony before the Senate Judiciary Committee on December 6, 2011, then-CEO of Medco, David Snow, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater [manufacturer payments] from drug manufacturers and other suppliers."[52] The then-CEO of Express Scripts, George Paz, during a Congressional subcommittee hearing in September 2011, echoed these sentiments: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."[53]

70. By the end of 2017, Express Scripts described itself as the "largest independent PBM company in the United States."[54]

71. In late 2018, Express Scripts consummated a $67 billion merger with Cigna Corporation. [55] The merger took another rival – Cigna's PBM – out of the market and exponentially enhanced Express Scripts' power through vertical integration with a massive health insurer.

72. In May 2019, in order to protect itself from the ongoing congressional inquiries and pending regulatory controls, Express Scripts launched Ascent, a GPO that served as another

[51] PR Newswire, *Express Scripts and Medco Health Solutions Sign Definitive Merger Agreement* (July 21, 2011), online at https://www.prnewswire.com/news-releases/express-scripts-and-medco-health-solutions-sign-definitive-merger-agreement-medco-shareholders-to-receive-291-billion-125940848.html (last visited June 30, 2026).

[52] Testimony of David B. Snow, Jr., Chairman & Chief Exec. Officer, Medco Health Solutions, Inc., Before the S. Subcomm. On Antitrust, Competition Pol'y & Consumer Rts. of the S. Comm. on the Judiciary, *The Express Scripts/Medco Merger: Cost Savings for Consumers or More Profits for the Middlemen?, 112th Cong. 47 (2011),*, online at https://www.govinfo.gov/content/pkg/CHRG-112shrg72806/html/CHRG-112shrg72806.htm

[53] Written Testimony of George Paz, Chairman & Chief Exec. Officer, Express Scripts, Inc., Before the Subcomm. On Intell. Prop., Competition & the Internet of the H. Comm. on the Judiciary *The Proposed Merger Between Express Scripts and Medco, 112th Cong. 4 (2011)*, online at https://judiciary.house.gov/sites/evo-subsites/judiciary.house.gov/files/2016-04/Paz-09202011.pdf.

[54] Express Scripts Holding Co., Annual Report (Form 10-K) (Feb. 27, 2018), online at https://www.sec.gov/Archives/edgar/data/1532063/000153206318000004/esrx-12312017x10k.htm

[55] Crow, David and Platt, Eric, *Cigna Unveils $67 billion deal to buy Express Scripts,* Financial Times (March 8, 2018), online at https://www.ft.com/content/8858b02c-22c7-11e8-ae48-60d3531b7d11?syn-25a6b1a6=1.

middleman inserted into the already-complicated drug distribution process. Ascent's stated purpose was to handle price negotiations with drug manufacturers. However, Express Scripts moved portions of Ascent's operations to Switzerland, a country known for its lack of financial transparency and low tax rates, making it difficult to regulate.

73. Today, Express Scripts is the largest PBM in the country, with its total adjusted prescription claims volume growing by 4.2 %, from 2.12 billion in 2024 to 2.22 billion in 2025.[56]

74. In Louisiana, Express Scripts is the PBM for BCBS-LA, the largest private health insurer in the state. Through its relationship with BCBS-LA and its affiliate HMO Louisiana, Inc., Express Scripts is far and away the dominant market player, with approximately 86.71% of Louisiana's private PBM market in 2024.[57]

75. Not only is Express Scripts vertically integrated with Cigna, but it also owns, operates, or is affiliated with specialty pharmacies (Accredo, Express Scripts Pharmacy, and others), drug manufacturers (Quallent Pharmaceuticals), and wholesalers (CuraScript SD).[58]

76. By virtue of its size and expansive influence, Express Scripts exercises market power throughout the State of Louisiana. Thus, both drug manufacturers and independent pharmacies have no choice but to conduct business with Express Scripts.

### B. Express Scripts' horizontal price fixing agreement with Prime unlawfully expended its market power.[59]

77. Express Scripts historically imposed reimbursement rates that were lower, and fees that were higher, than those of Express Scripts' competitors. In theory, this gave Express Scripts'

[56] Cigna Corp. 2025 Annual Report, supra note 17.
[57] Louisiana Department of Insurance, *Market Share Reports*, located at https://www.ldi.la.gov/onlineservices/TopTwentyPremiums (last visited June 30, 2026).
[58] Top PBMs, supra note 10.
[59] Virtually identical price-fixing allegations have already withstood scrutiny in two separate proceedings involving Defendants:, *See, e.g., Osterhaus Pharmacy v. Express Scripts*, 768 F. Supp. 3d 1186, 1197-98 (W.D. Wash. 2025) (antitrust class action targeting the Prime-ESI Agreement that recently survived a motion to dismiss in the Western District of Washington); , *AHF v. Prime*, No. 01-22-0000-2756, Interim Award on the Merits (Am. Arb. Ass'n Jan.

rival PBMs an advantage in seeking business from pharmacies. To eliminate this competition, Express Scripts entered into the Agreement with Prime, a much smaller PBM, to rent Express Scripts' network.

78. The Agreement originated in December 2019 when Prime acquired minority ownership in Ascent. Shortly thereafter, on December 19, 2019, Express Scripts and Prime announced a "collaboration" pursuant to which Express Scripts would "provide services to Prime related to retail pharmacy network and pharmaceutical manufacturer contracts."[60] This consolidation allowed Ascent to manage rebates for millions more Covered Individuals, enhancing its negotiating leverage with drug manufacturers, and allowing Express Scripts and Prime to shield their rebate systems from potential regulatory action.

79. Ascent played a key role in the Express Scripts-Prime Agreement from the outset. In the words of Prime's President and CEO Ken Paulus – "the core of the relationship is around a GPO, a group purchasing organization, by the name of Ascent . . .we co-own the GPO . . .[i]t's fully transparent.[61] The terms of the collaboration provided that rebate negotiations with manufacturers for drugs covered by a commercial Plan Sponsor's pharmacy benefits would be handled jointly by Ascent.

80. After uniting under Ascent banner, Express Scripts and Prime soon learned that increased leverage in the marketplace was not the only profitable by-product of collaboration.

---

17, 2025) (Widman, Arb.) (price-fixing suit brought by the AIDS Health Foundation ("AHF") against Prime, which recently resulted in a final judgment in AHF's favor of $10 million from the American Arbitration Ass.).

[60] *Express Scripts and Prime Therapeutics Collaborate to Deliver More Affordable Care to More Than 100 Million Americans,* Press Release, The Cigna Group (December 19, 2019), online at Express Scripts and Prime Therapeutics Collaborate to Deliver More Affordable Care to More than 100 Million Americans | Cigna Newsroom.

[61] Wehrwein, Peter, *PBM Leaders: A Conversation with Ken Paulus, Prime Therapeutics President and CEO, Part 3,* Managed Healthcare Executive (September 28, 2021), online at PBM Leaders: A Conversation with Ken Paulus, Prime Therapeutics President and CEO, Part 3 | Managed Healthcare Executive.

Ascent was also another avenue with which to harmonize and increase drug prices, rebates, fees and pharmacy reimbursements.

81. The Express Scripts-Prime Agreement provided that Prime would fix its pharmacy reimbursement rates and fees to Express Scripts' reimbursement rates and fees. As a result, Express Scripts and Prime would both benefit from lower reimbursement rates and higher fees imposed on pharmacies by, in effect, allowing Prime to rent Express Scripts' market power.

82. Aside from the Agreement to fix prices, Express Scripts and Prime continued to work independently with pharmacies. Prime disavowed any intention of combining business functions with Express Scripts so as to potentially increase efficiency or economies of scale. Although Prime's reimbursement rates and fees were established by Express Scripts' price schedule, Prime advised pharmacies on February 28, 2020, that it would continue to process claims on behalf of its Plan Sponsors. The only participation by Express Scripts in the process was to add an Express Scripts network identifier to the Prime computer system so that the Express Scripts reimbursement rates and fees would be imposed on Prime's transactions.

83. As Paulus told *Managed Healthcare Executive* in an interview on September 28, 2021:[62]

> The beauty of the relationship [between Prime and Express Scripts] is that we [Prime] didn't really hand over the keys. […W]e really didn't change anything at Prime other than that. We still process our own claims. We own the claim system. We do all of our own PAs, contact center, utilization management – we do everything ourselves. But that piece [retail pharmacy contracting] sits off behind the scenes, and then feeds our systems. […W]e're basically still doing all the functions of the PBM except for the procurement [of pharmacy contracts].

84. Paulus's comments make clear that the Agreement with Express Scripts did not result in the combination of assets or capabilities owned by the two PBMs. Nor did it result in the

[62] *Interview with Ken Paulus,* supra note 52.

creation or sale of any new product or service. According to Paulus, " . . . the core performance improvement was more along the lines of being more strategic and aligned with our formulary strategy."[63] Said another way, the Agreement was merely a naked price-fixing arrangement between Prime and Express Scripts.

85. Express Scripts and Prime trumpeted their new alliance as an important step towards delivering "more affordable healthcare."[64] But in reality, the alliance between these two competitors further escalated out-of-pocket drug costs to many of Louisiana's citizens while Express Scripts and Prime reaped the true benefits. The Express Scripts-Prime Agreement added roughly 28 million Covered Lives to Express Scripts' bargaining leverage,[65] making Express Scripts' power in the marketplace even more formidable than before.

86. The practical function of Ascent was largely to help Express Scripts and Prime consolidate their rebate scheme and grant the PBMs even greater bargaining leverage, with the benefits flowing to the PBMs' bottom lines. This fact is perhaps best illustrated by the fact that Ascent rebate agreements contained substantially the same framework that Express Scripts so successfully utilized: (a) Ascent was compensated through administrative fees and rebates paid by manufacturers some of which were calculated as a percent of the List Price; (b) rebate amounts depended upon a product's formulary status, and formulary eligibility and status depended upon a manufacturer's rebate bid; (c) Ascent protected its rebates and margins by requiring manufacturers to sign inflation agreements or provide inflation guarantees to ensure Ascent – and by extension, the PBMs – is shielded from rising prices; and (d) Ascent required parties to agree to broad

---

[63] *Id.*
[64] Cigna Press Release, supra note 51.
[65] *Id.*

confidentiality provisions to extend to wide categories of information, including the terms of the rebate agreements and even the existence of the agreements themselves.

87. In sum, the collusion between Express Scripts and Prime vastly expanded their collective market power and eliminated competition. As explained in further detail below, Defendants and Prime abused their newfound market power by extorting fees from drug manufacturers in exchange for formulary access, and diverting the profits obtained from those fees to line their own pockets.

**C. Defendants falsely represent that they work to lower drug prices and act in the best interests of Plan Sponsors and consumers.**

88. Defendants have marketed their businesses by claiming to lower drug costs for the Plans they are contracted to manage. Defendants have consistently made misrepresentations about cost savings, drug pricing, payments to manufacturers, formulary construction, and their own roles in the drug pricing system.

89. For example, during an interview with CBS News in 2017, Express Scripts CEO Tim Wentworth claimed that PBMs played no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."[66] In another instance, during an Express Scripts' earning call on February 15, 2017, Wentworth reiterated his position, stating that "Drugmakers set prices and we exist to bring those prices down."[67]

90. Express Scripts has also routinely asserted in public statements that its drug formulary design and drug rebate negotiations aim to lower the prescription drug expenditures of payors, and that it was dedicated to being transparent regarding payments and costs.

---

[66] *Express Scripts CEO on PBMs and rising costs of drug,* CBS News, (Feb. 7, 2017), online at Express Scripts CEO on PBMs and rising costs of drugs - CBS News

[67] McElhaney, Alicia, *Express Scripts Officials Use Earnings Call to Blame Pharma for Drug Pricing,* The Street.com (Feb. 15, 2017),online at https://www.thestreet.com/investing/stocks/express-scripts-officials-use-earnings-call-to-blame-pharma-for-drug-pricing-14003432

91. Ascent too reiterates its commitment to lowering costs and terms on its website, which boasts that Ascent negotiates "better pharmaceutical discounts and supply terms on behalf of health plans."[68] Edward Adamcik, Ascent's President, is quoted on the website as stating that "Ascent leverages market intelligence and develops strategies that provide health plans with more competitive coverage."[69]

92. For example, on May 10, 2023, PBM executives testified before the Congressional Senate Health, Education, Labor, and Pensions ("HELP") Committee in a hearing entitled "The Need to Make Insulin Affordable for All Americans" ("2023 Senate Hearing"). At this hearing, Adam Kautzner, Express Scripts' President, testified, "Without the ability to use [rebates] to achieve lower drug costs, health care spending would be much higher."[70] Kautzner made other representations during the hearing, including that Express Scripts works to "shield patients from high list prices set by manufacturers" and that Express Scripts delivers "clear contracting options" for its clients and "price transparency" for patients.[71]

93. Express Scripts not only falsely represents that it lowers the price of drugs for payors, but for patients as well. Express Scripts' publicly available code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to patients and clients . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable."[72] In April 2019, Amy Bricker, then Senior Vice President of Express Scripts, testified at a Congressional hearing that "At Express Scripts we

---

[68] Ascent Health Services, Ascent Health Services, (last visited July 1, 2026)..
[69] *Id.*
[70] Testimony of Adam Kautzner, President, Express Scripts, Before the S. Comm. on Health, Educ.,Lab. And Pensions, *The Need to Make Insulin Affordable for All Americans,* 118th Cong. 1,online at The Need to Make Insulin Affordable for ... | Senate Committee on Health, Education, Labor and Pensions.
[71] *Id.* at *6.
[72] Express Scripts, *Code of Conduct*, at *2, online at https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited July 6, 2026).

negotiate lower drug prices with drug manufacturers, leveraging competition to help drive savings for clients" and that those discounts "ultimately benefit patients in the form of lower premiums and reduced out-of-pocket costs"[73]

94. Express Scripts has also made statements in defense of its business practices. Yet again in July 2024, Kautzner testified before the House Oversight Committee in defense of the company's PBM business practices. During the hearing, lawmakers questioned PBM executives about their vertical integration, patient steering practices, manipulation of drug formularies, and rebate agreements with drug manufacturers. These executives, including Kautzner, denied that their business practices raised drug costs.

95. At least one lawmaker, James Comer, a U.S. Representative from Kentucky who serves as Chairman of the Committee on Oversight and Accountability, identified several assertions by Kautzner as inconsistent with the findings of the FTC's investigation of the PBM industry.[74] In a letter dated August 28, 2024, Comer highlighted Kautzner's false and misleading statements, offering Express Scripts an opportunity to correct the record, which Express Scripts declined.

96. First, Comer noted that Kautzner testified that Express Scripts did not steer patients to PBM-owned companies. Kautzner stated:

> So one, we do not steer. Our clients make the decision on which pharmacies they decide to put into their network, and our data would show that in the last year, mass retailers saw a 6 percent increase in pharmacy prescriptions. In the last 5 years, grocers saw an increase of 23 percent, while in the last year, our home delivery pharmacy had a relatively flat volume.

---

[73] Testimony of Amy Bricker, R.Ph., Senior Vice President, Supply Chain, Express Scripts, Before the H. Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Com., *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin* (Apr. 10, 2019), 116th Cong. 2, *4, online at https://www.congress.gov/116/meeting/house/109299/witnesses/HHRG-116-IF02-Wstate-BrickerA-20190410.pdf

[74] Comer, J., *Letter to Adam Kautzner,* The United States House of Representatives website (August 28, 2024), online at Letter to Dr. Kautzner on PBM Testimony - United States House Committee on Oversight and Government Reform, (last visited July 1, 2026) (hereinafter "Comer Letter").

97. As Comer pointed out, these statements and others contradicted both the Committee's and the FTC's findings that Express Scripts did, in fact, steer patients to PBM-owned or affiliated pharmacies. The Committee found evidence, detailed in its report, that Express Scripts engaged in targeted outreach to patients, using data the PBM received from competing pharmacies, encouraging patients to move their prescriptions to Express Scripts' mail order pharmacy.[75]

98. Comer also pointed out Kautzner's testimony that Express Scripts allowed non-affiliated pharmacies to redline and negotiate their contracts.

**Exchange:**

| | |
|---|---|
| Congressman Fry: | How much opportunity exists for a small mom-and-pop pharmacy in a rural area to negotiate their own contract? Is it a boilerplate contract? Do they have any negotiating room at all? Say I own my own pharmacy. |
| Dr. Kautzner: | We are always open, Congressman, to negotiating with pharmacies. |
| Congressman Fry: | How does that look? |
| Dr. Kautzner: | Pharmacies can always redline a contract back to us and negotiate. |

99. These statements were also contrary to evidence received by the Committee from multiple pharmacies that had attempted – unsuccessfully – to redline contracts and negotiate with Express Scripts. In fact, the Committee found that Express Scripts informed the pharmacies that "rates are non-negotiable," and "[t]he rate exhibit provided offers our best and final rates."[76] Furthermore, the FTC's interim staff report stated, "Independent pharmacies generally lack the leverage to negotiate terms and rates when enrolling in PBMs' pharmacy networks, and

[75] *See,* House Report, supra note 15.
[76] *Id.*

subsequently may face effectively unilateral changes in contract terms without meaningful choice and alternatives."[77]

100. Defendants made the foregoing misrepresentations and others consistently and directly to Louisiana patients through communications with Covered Individuals, formulary change notifications, and through direct-to-consumer efforts and marketing.

101. Defendants knowingly made these false and misleading statements and others to deceive consumers, Plan Sponsors, and the public. Indeed, contrary to their representations that they lower drug prices for patients and Plan Sponsors and as explained in detail below, Defendants' formulary construction, the payments and fees they demand from manufacturers, and the manner in which they steer patients to Express Scripts' own pharmacies have caused drug prices paid by patients and Plan Sponsors to significantly increase.

102. Moreover, Defendants concealed the falsity of these representations by closely guarding its pricing structures, agreements, and sales figures. Express Scripts does not disclose to patients, Plan Sponsors or the public the details of its agreements with drug manufacturers or the payments they receive from them—nor does it disclose the details related to its agreements with Plan Sponsors and pharmacies.

### D. Express Scripts' business models drive up prices for patients and Plan Sponsors and Forecloses Access to Lower Priced Drugs.

103. Despite Defendants' representations to consumers and Plan Sponsors, numerous data sources tell a different story. In fact, Express Scripts operated a business model that was intentionally designed to increase drug prices for its own benefit.

104. Express Scripts profits from higher drug prices on rebate-able prescription drugs. Express Scripts and its affiliates receive rebates, administrative fees, data-sharing fees, and other

[77] FTC Report, supra note 7.

manufacturer payments, some of which may vary with a drug's price, sales, utilization, or other contractual metrics. These payment structures incentivize manufacturers to maintain or increase prices to offset the rebates, fees, and other concessions they pay. Express Scripts and its affiliates retain a portion of the rebates, fees, and other payments from manufacturers as profit while obscuring this information from the Plan.

105. Separately, Express Scripts also generates profits through employing pharmacy reimbursement strategies that include, among others, spread pricing and the reconciling of claims to certain contractual guarantees. As indicated above, spread pricing refers to the difference between what a Plan pays a PBM for a prescription drug claim and the amount the PBM reimburses the pharmacy for dispensing the same drug claim. Additionally, when a PBM later recoups money through reconciliation of network-pricing guarantees and does not credit that to the Plan, it reduces the pharmacy's net reimbursement and increases the spread retained by the PBM. Spread pricing—at either the transaction or during reconciliation stage—not passed on to the Plan effectively increases the Plan's prescription-drug costs and places financial pressure on both pharmacies and consumers.

106. Express Scripts also uses rebate strategies, spread pricing and network guarantees to generate profits from its own mail order or specialty pharmacies. In addition, Express Scripts may employ more favorable reimbursement terms that place competing pharmacies at a disadvantage or steer prescriptions to its owned or affiliated pharmacies to increase the dispensing volume and overall profit. These tactics place unaffiliated pharmacies at a disadvantage not only their expense, but at the expense of Plans and consumers.

107. Consequently – and in direct contradiction to its representations – Express Scripts is driving up the price of drugs, foreclosing patients and payors access to lower priced drugs, and working against the interests of Plan Sponsors and consumers to increase their own profits.

**1. Express Scripts constructs formularies and negotiates manufacturer Payments in a manner that causes drugs to cost more than they would in a properly functioning market.**

108. As Defendants well know, manufacturers generally need their drugs to be placed on a PBM's formulary to be covered by insurance. This gives Express Scripts great leverage over drug manufacturers.[78]

109. Express Scripts requires manufacturers – as a condition of appearing on its formularies – to pay administrative fees and rebates that are frequently calculated with List Price as a material part of the equation.

110. Express Scripts threatens to deny favorable formulary tier position to – or to outright exclude from the formulary – any drug for which the manufacturer will not pay the demanded fees and rebates.

111. The result is straightforward – because Express Scripts' contracts with manufacturers calculate rebates and other price concessions in which the List Price is a material factor, manufacturers are incentivized to increase their List Price to preserve their net revenue after paying Express Scripts.

112. In fact, a February 2020 white paper by the Leonard D. Schaffer Center for Health Policy & Economics at the University of South Carolina found that an increase in the amount that

---

[78] *See,* Fein, Adam, *The Big three PBMs' 2026 Formulary Exclusions: MFP, Private Label Biosimilars, and Direct-to-Patient Threats for PBMs,* Drug Channels Institute (January 22, 2026), online at Drug Channels: The Big Three PBMs' 2026 Formulary Exclusions: MFP, Private Label Biosimilars, and Direct-to-Patient Threats for PBMs (noting that formulary exclusion is one of the most powerful tools for PBMs to gain negotiating leverage against manufacturers, thus manufacturers offer deeper rebates of the List Price to avoid having their drugs cut from a PBM's formulary).

drug manufacturers pay back to the PBMs is directly correlated to an increase in List Price – on average, a $1 increase in manufacturers payments to PBMs was associated with a $1.17 increase in List Price – and that reducing or eliminating manufacturers payments to PBMs could lower prices and reduce out of pocket expenditures.[79]

113. The higher the rebates, fees, and other price concessions that Express Scripts extracts from manufacturers in exchange for formulary placement raise out-of-pocket costs for patients, often resulting in reduced compliance with medication regimes, and thus a sicker overall population for Plan Sponsors and States like Louisiana.

114. Express Scripts' use of outright formulary exclusion has accelerated rapidly in recent years. As illustrated below, Express Scripts' formulary exclusion has outpaced the other largest PBMs since at least 2012.

**Number of Products on PBM Formulary Exclusion Lists by PBM, 2012-2026**




[79] Sood, Neeraj, et al, *The Association between Drug Rebates and List Prices,* Leonard D. Schaffer Center for Health Policy & Economics, University of South Carolina (February 11, 2020), online at The Association Between Drug Rebates and List Prices - February 11, 2020 - USC Schaeffer.

115. In fact, between 2025 and 2026, the number of products excluded from the formularies of the other dominant PBMs decreased but grew for Express Scripts.[80]

116. While the Defendants argue that formulary exclusions and manufacturer payments reduce costs, the evidence shows otherwise. A 2017 study from the Tufts Center for the Study of Drug Development found that cost-effectiveness does not appear to correlate with a drug's excluded or recommended status.[81] The Tufts study conducted a head-to-head comparison of excluded versus recommended drugs in the same therapeutic class. In nine out of eighteen instances, the more cost-effective drug was excluded from coverage. In comparing the exclusion lists of CVS Caremark and Express Scripts, fourteen drugs were excluded by one PBM but recommended by the other, suggesting that rebates played a role in determining excluded versus recommended status.[82]

117. Express Scripts' exclusionary tactics raise drug prices and harm competition by forcing manufacturers to compete *to enter the market in the first place*, according to rules set by Express Scripts, rather than compete *in* the market for patients, according to patient needs and preferences. This market power allows Express Scripts to extract massive rebates from manufacturers fearful of exclusion and even larger rebates from manufacturers seeking to exclude competitors.

**2. Express Scripts restricts patients' access to generic or lower-priced medications by favoring brand name drugs on its formularies.**

118. Express Scripts not only manipulates its formularies to drive List Prices upward, but it also severely limits patients' ability to choose lower-priced medications by favoring more

[80] *Id.*
[81] Cohen Joshua P., et al, *Rising Drug Costs Drives the Growth of Pharmacy Benefit Managers Exclusion Lists: Are Exclusion Decisions Value-Based?,* Health Services Research (October 18, 2017), online at Rising Drug Costs Drives the Growth of Pharmacy Benefit Managers Exclusion Lists: Are Exclusion Decisions Value-Based? - PMC
[82] *Id.* at Table 4.

expensive, brand name medications on its formularies. Because brand name drugs come with rebates, and Express Scripts retains a portion of those rebates, Express Scripts is incentivized to include the brand name drug in its formulary when the brand produces a greater value to the PBM regardless of whether it produces the lowest net cost to the Plan or consumer. This practice limits competition from lower-cost generics and increases costs for patients.

119. The NYT PBM Investigation found that " . . . [e]ven when an inexpensive generic version of a drug is available, PBMs sometimes have a financial reason to push patients to take a brand-name product that will cost them much more."[83] The report continued on:

> Express Scripts typically urges employers to cover brand-name versions of several hepatitis C drugs and not the cheaper generic versions. The higher the original sticker price, the larger the discounts the PBMs finagle, the fatter their profits – even if the ultimate discounted price of the brand name drug remains higher than the cost of the generic. [84]

120. The result of business model is that the first-line treatment decision can be driven by the financial interests of Express Scripts and not the evidence-based judgment of a qualified physician.

121. "Express Scripts fights to ensure clients and consumers have access to safer, effective, and affordable medications and life sustaining or lifesaving therapies."[85] These public statements and others reiterating that Express Scripts tirelessly and transparently works towards lowering drug cost for customers, that Defendants do not drive up drug costs, and that Defendants' formulary design and rebate decisions both favor its customers and are not based on Defendants' own financial incentives, are all materially false and misleading.

---

[83] NYT PBM Investigation, supra note 42.
[84] *Id.*
[85] *See,* Evernorth, *The value Express Scripts delivers*, online at The Value Express Scripts Delivers | Evernorth. (last visited July 6, 2026).

122. Far from using their prodigious bargaining power to lower drug prices and promote patient health as they represent, Defendant uses its dominant position to drive up prices and foreclose patients' access to lower priced drugs in order to generate enormous profits. Despite their representations and duties, Defendants and their co-conspirators are working directly against the best interests of the State and Louisiana consumers.

**3. Express Scripts raises drug prices through their specialty and mail order pharmacies.**

123. A third way Defendants and their co-conspirators drive up drug prices and harm patients and Plan Sponsors is through their affiliated pharmacies, and, in particular, the manner in which they classify drug prices sold through these pharmacies.

124. As explained above, Express Scripts is part of a vertically integrated corporate family that includes mail order and specialty pharmacies, among other entities. Specifically, Express Scripts is affiliated with Accredo, a specialty pharmacy, and other mail order pharmacies.

125. By owning their own pharmacies, Express Scripts can steer Covered Individuals to those pharmacies by requiring them to utilize their specialty and mail order pharmacies. When a PBM requires Covered Individuals to obtain "specialty" drugs from the PBM's own "specialty" pharmacy, such as Accredo, it provides powerful incentives for the PBM to keep higher reimbursement rates and Plan payment rates to these pharmacies and to designate generic drugs as "specialty" drugs. PBMs—through, *inter alia*, its Plan design, coverage rules, cost-sharing, pharmacy network rules, prior authorization requirements, or formularies—can classify a generic as a specialty drug, which requires it be dispensed by a certain type of pharmacy.

126. Steering patients to its own pharmacies provided Express Scripts the opportunity to "agree" to excessively high reimbursement rates (i.e., reimbursement rates that greatly exceed the pharmacy's actual dispensing and ingredient cost to acquire and dispense the drugs) allowing the

vertically integrated PBM-enterprise to retain the resulting margins. At the same time, Express Scripts was imposing reimbursement rates unfavorable for independent pharmacies or others not affiliated with the PBM.

127. As a result, Express Scripts charges patients and payors far more than the drugs actually cost the pharmacy to acquire and dispense, and then Express Scripts or its affiliated pharmacy, Accredo, generate greater revenue.

128. PBMs are motivated to give preferential treatment to more expensive generic "specialty" drugs so as to maximize their revenue margins. If two similar generic "specialty" drugs cost roughly the same for Express Scripts specialty pharmacy Accredo to acquire, but one drug has a higher reimbursement rate to Accredo and Express Scripts can charge more to the Plan, Express Scripts may have an incentive to favor that drug through coverage, formulary design, dispensing, or steering practices. If the PBM includes only the drugs with the higher reimbursement rate to Accredo in its practices, patients and Plan Sponsors will be forced to pay more without any corresponding benefit other than profit for Express Scripts. Beyond the greater revenue margin based on favoring a higher cost prescription, Express Scripts realizes additional financial gain by retaining any spread between the amount paid to the PBM by the Plan and the amount the Express Scripts paid Accredo for dispensing the drug, together with any amounts exceeding the contractual network guarantees. Rather than serving as cost-saving mechanisms for the Plan, these arrangements prioritize Express Scripts' financial interests over the Plan's goal of minimizing prescription drug expenditures.

129. According to the FTC, pharmacies affiliated with the Big Three, including Express Scripts, have marked up numerous specialty generic drugs dispensed at their affiliated pharmacies

by thousands of a percent, and many others by hundreds of a percent, over the National Average Drug Acquisition Cost ("NADAC").[86]

**Figure 1. Number of Specialty Generic Drugs Dispensed by Affiliated and Unaffiliated Pharmacies by Markup Category, Segmented by Commercial and Medicare Part D Claims, 2020-2022**




130. By classifying generic drugs as a specialty drugs, and steering to its owned or affiliated pharmacies, the pharmacy then can choose to dispense the "generic" specialty drug with the highest reimbursement, and, in turn, Express Scripts is able to charge Plan Sponsors and patients in Louisiana excessive prices for what should be more affordable drugs.

**E. <u>Express Scripts and Ascent conceal and retain manufacturer payments as profits.</u>**

131. While creating and maintaining a system that increased its own profits, Express Scripts sought to retain these profits, including payments and savings that it should have passed on to Plans pursuant to their contracts.

[86] NADAC is an index of drug acquisition costs based on surveys of invoices voluntarily provided to the Centers for Medicare & Medicaid Services ("CMS") primarily by small, independent pharmacies. *See*, Federal Trade Commission, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers*, at *5, 19, (Jan. 2025), online at https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf.

132. Historically, PBM contracts allowed the PBMs to keep all or at least some of the payments negotiated with manufacturers, rather than pass them along to their clients, albeit with some level of transparency.

133. Over time, payors have secured contract provisions guaranteeing them all or some portion of the "rebates" paid by the manufacturers to the PBMs. This apparent victory for Plan Sponsors, however, was a fiction.

134. Instead, Express Scripts simply began to rename and recategorize large portions of the monies flowing in from the manufacturers. Suddenly, Express Scripts received increasingly more "administrative service fees," "inflation fees," "service fees," or similarly labeled payments from manufacturers.

135. Yet again, Express Scripts prevents Plan Sponsors from seeing the value that they are getting – or more accurately, the value they are not getting – from their contracts with the powerful PBM by cloaking all transactions and contracts with secrecy and confidentiality, making it virtually impossible to meaningfully audit the performance of any Express Scripts' contracts.

136. Express Scripts also uses Ascent to hide these rebates-disguised-as-fees from Plan Sponsors. While Express Scripts claims that Ascent was created to negotiate drug prices with drug companies, it also uses Ascent to receive payments or "fees" from drug companies in exchange for formulary access and placement or other valuable consideration. In doing so, Express Scripts is able to disguise payments from drug companies that would have previously been deemed "rebates" and "manufacturers administrative fees" if paid directly to Express Scripts, all in an attempt to circumvent their contractual obligations.

137. It also makes Express Scripts' operations even less transparent and harder for Plan Sponsors to audit.

138. For example, in March 2024, an Inspector General of the U.S. Office of Personnel Management ("OPM-USOIG") released a report on Express Scripts' provision of prescription drug benefits to 200,000 postal workers and retirees.[87] For just this one federal employee plan, the audit revealed that Express Scripts had overcharged the postal workers' health plan by $45 million over five years. The largest chunk — approximately $14.4 million — was in rebates retained by Ascent, despite the fact that the Express Scripts' contract required 100% pass-through of rebates.

139. The sheer magnitude of Defendants' improper diversion and retention of payments is made clear by comparing the total amount of rebates that Express Scripts shared with the Plan Sponsor, in this case, the American Postal Workers Union ("APWU") in 2019 and 2020, and the amount of the rebates Defendants improperly withheld using Ascent. According to the OPM-OIG Report, the Plan received $68.3 million in rebate credits from Express Scripts in 2019 and $61.8 million in 2020. The $14.4 million in rebates that Defendants improperly withheld from APWU using Ascent over 19-month period, therefore, were more than 10% of the rebates that the APWU received from Express Scripts in 2019 and 2020.[88]

140. OPM-OIG also conducted an audit of Express Scripts' pharmacy operations for the Compass Rose Health Plan, another federal employee health plan. [89] That audit determined that Express Scripts overcharged the FEHBP by over $18 million between 2017 and 2022 by not passing through all discounts and credits related to prescription drug pricing pursuant to its contract.[90] Specifically, the audit determined that Ascent erroneously withheld a portion of the drug

---

[87] Off. of Inspector Gen., U.S. Off. of Pers. Mgmt., *Audit of the American Postal Workers Union Health Plan's Pharmacy Operations as Administered by Express Scripts, Inc. for Contract Years 2016 Through 2021, Rep. No. 2022-SAG-029 (Mar. 29, 2024), online at* https://oig.opm.gov/reports/audit/audit-american-postal-workers-union-health-plans-pharmacy-operations-administered-0
[88] *Id.*
[89] Off. of Inspector Gen., U.S. Off. of Pers. Mgmt., *Audit of Compass Rose Health Plan's Pharmacy Operations as Administered by Express Scripts, Inc. for Contract Years 2017 Through 2022,* Rep. No. 2023-SAG-019, (Nov. 14, 2024), online at https://www.oversight.gov/sites/default/files/documents/reports/2025-01/2023-SAG-019.pdf
[90] *Id.*

manufacturer rebates from June 2019 through December 2021, resulting in over $10 million due to the Plan Sponsor.[91]

141. The FTC's investigation reached similar conclusions about Cigna's improper diversion of rebates using Ascent. After analyzing documents and data produced by Express Scripts and Ascent, the FTC report stated that Cigna and its peer PBMs formed "rebate aggregators" like Ascent for the purposes of retaining revenues received from drug manufacturers. As a result, as illustrated below, the FTC noted that healthcare analysts estimated that Express Scripts and other PBMs have "extracted from drug companies billions of dollars in additional fees, which nearly doubled from approximately $3.8 billion in 2018 to 7.6 billion in 2022."[92]




142. Such fees barely existed before Express Scripts created Ascent. For example, between 2018 and 2022, the combination of administrative fees, contracting entity vendor fees, data/portal fees and supplemental or uncategorized fees increased from 3.43% of U.S. Commercial

[91] *Id.*
[92] FTC Report, supra note 7.

brand sales in 2018 to 4.39%, despite the decline in manufacturer administrative fees over this same period. [93] Conveniently for Express Scripts, Ascent, and their conspirators, manufacturer administrative fees are the only fees set to pass through to their PBM customers.

143. Interviews with former executives lay bare the predatory nature of the fees that Express Scripts and Prime have made drug companies pay to Ascent. A former executive at a major drug company, for example, explained to the NYT that his responsibilities at the drug company included negotiating with entities like Ascent.[94] According to this former drug company executive, he had a set pool of money to cover both rebates and fees for entities like Ascent, and when he was asked to pay more in fees, he offered less in rebates. PBM customers were entirely unaware of this trade-off because the Plan Sponsors could not see the billions of dollars in fees that were paid to and retained by Ascent.[95]

144. Recently on February 4, 2026, the FTC secured a settlement with Express Scripts in its lawsuit alleging that Express Scripts' conduct resulted in artificially inflated insulin prices (the "FTC Order"). [96] The FTC Order requires that Express Scripts increase transparency to its PBM customers, in tacit acknowledgment of its GPO-related misconduct.[97] For example, it mandates that Express Scripts provide drug-level reporting and data to permit compliance with United States Transparency in Coverage regulations, and also requires that Express Scripts disclose

---

[93] Percher, Eric, *Trends in Profitability and Compensation of PBMs & PBM Contracting Entities,* Nephron Research (September 18, 2023), online at https://cdn.ymaws.com/www.wsparx.org/resource/resmgr/legislative_session/2024/pbm_campaign/nephron_pbm.pdf

[94] NYT PBM Investigation, supra note 42.

[95] *Id.*

[96] Proposed Decision and Order as to ESI Respondents, *In Re: Caremark Rx, LLC, Zinc Health Services, LLC, Express Scripts, Inc., Evernorth Health, Inc., Medco Health Services, Inc., Ascent Health Services LLC, OptumRx, Inc., OptumRx Holdings, LLC, & Emisar Pharma Services LLC,* FTC Docket No. 9437 (February 4, 2026), online at https://www.ftc.gov/system/files/ftc_gov/pdf/d09437caremarkproporder-esiresps.pdf

[97] *Id. at *9.*

payments to any consultants or brokers representing its PBM customers.[98] Additionally, the FTC Order requires Express Scripts to provide more standard offerings to its PBM customers, that ensures that Covered Individuals' out-of-pocket expenses will be based on the drug's net cost, rather than its artificially inflated List Price or other pricing benchmark that is higher than the net cost.[99] Finally, FTC Order requires that Express Scripts move all "activities, employees, functions, and assets used by [] Ascent for the purpose of rebate negotiating and contracting" from Switzerland to the United States."[100]

### F. Express Scripts leverages its market power to harm and diminish competition with independent pharmacies.

145. Independent pharmacies play a crucial role in the Louisiana healthcare system by dispensing medications, compounding medications, and managing medication therapy.

146. Independent pharmacies generally cannot decline to deal with Express Scripts because it controls access to over 80% of the Louisiana private market. Independent pharmacies have no realistic option other than to accept Express Scripts' terms because they cannot reasonably operate if they are cut off from such a large segment of potential customers.

147. Express Scripts' market power is further cemented by the fact that Plans dictate PBM services. By the time a patient arrives at the pharmacy counter to obtain prescription drugs, the PBM that will process that transaction is set. Claims are processed through the Express Scripts automatically, with neither the patient nor the pharmacy having the option to switch to a different PBM to seek better reimbursement rates or lower fees.

[98] *Id*. at *8.
[99] *Id*. at *6.
[100] *Id.* at *9.

148. A pharmacy can hypothetically refuse to contract with Express Scripts, but the predictable result is that customers compelled to use Express Scripts' network will be forced to take their prescription drug business to other pharmacies.

149. Express Scripts' immense market power is evidenced clearly in its hard, one-sided contract terms with independent pharmacies. It wields the threat of exclusion from its pharmacy networks – and thus foreclosure from access to its pharmacy customers in the State of Louisiana – to extract severally lopsided contract terms from the independent and retail pharmacies who need those customers to stay in business.

150. Express Scripts uses several methods to attack independent pharmacies. First, it under-reimburses independent pharmacies by coercing them into contracts with exceedingly low – often below-cost – reimbursement rates. Second, Express Scripts imposes exorbitant and constantly increasing administrative fees and other egregious contract terms upon them. Third, it regularly imposes oppressive and often mysterious fees, adjustments, and reconciliations that are assessed and "clawed back" weeks or months after the drug is dispenses to the consumer with little or no explanation or notice. Finally, Express Scripts engages in patient steering techniques, including formulary and price manipulation, while prohibiting independent pharmacies from doing the same.

**1. Express Scripts reimburses retail pharmacies below acquisition costs.**

151. Express Scripts secured its chokehold on independent pharmacies through its price-fixing agreement with Prime. Express Scripts uses its market power to force Louisiana's independent pharmacies to agree to reimbursement levels far lower than they ever would in a competitive market.

152. In general, Express Scripts reimburses independent pharmacies on a net basis less than chain pharmacies or their affiliates for the same drugs and for providing the same services. This is consistent with the FTC's findings that the "Big Three" PBMs often pay their affiliated pharmacies higher reimbursement rates than those they pay unaffiliated pharmacies for these expensive drugs. The below chart from the FTC compares reimbursement rates paid to pharmacies affiliated with the Big Three PBMs and the average reimbursement rates paid to unaffiliated pharmacies for the same set of drugs from 2020 to 2022. During this period, pharmacies affiliated with Express Scripts and the rest of the Big Three were almost always reimbursed at higher rates than unaffiliated pharmacies (sometimes more than double what unaffiliated pharmacies were paid for the same drug). The disparity between affiliated and unaffiliated reimbursement rates is larger for commercial plan prescriptions (shown as circles) compared with Medicare Part D prescriptions (triangles).

**Figure 3. Ratios of PBM-Affiliated and Unaffiliated Pharmacy Reimbursement Rates for Specialty Generic Drugs Dispensed by All Big 3 PBMs as Specialty Drugs, Segmented by Commercial and Medicare Part D Claims, 2020-2022 Averages**



153. As a result of its lopsided reimbursement practices, Express Scripts often reimburses pharmacies at net rates (post adjustments) that are below the pharmacies' cost of acquiring the medications. This practice puts significant financial pressure on pharmacies, particularly independents, which may not have the negotiating power to secure better terms.

154. Moreover, through the manipulation of generic drug rates – or MAC pricing – retail pharmacies are actually often dispensing drugs below cost.

155. Not only are the reimbursement rates that Express Scripts demands that independent pharmacies accept exceedingly low in the first instance, but the problem is compounded by Express Scripts' customary reservation of a contractual right to lower these rates even further – without notice – at its whim.

**2. Express Scripts imposes fees, audits, and other onerous contract terms.**

156. The great imbalance in bargaining power in Express Scripts' favor also yields contracts with independent pharmacies that contain egregious fees and penalty provisions that the latter are powerless to reject due to devastating consequences of losing access to Express Scripts' networks. Not only are the terms onerous, the contracts between Express Scripts and pharmacies are highly complex and opaque, making it difficult – and often impossible – for pharmacies to fully understand the terms. This complexity can include the convoluted reimbursement formulas, various fees, and performance metrics, discussed below. In addition, independent pharmacies typically do not even have access to the complete terms of their contracts with Express Scripts because the PBMs require the independent pharmacies to contract through a third party called a Pharmacy Services Administrative Organization ("PSAO").

157. Express Scripts, like other PBMs, charges pharmacies various types of Direct and Indirect Remuneration (DIR) fees. These fees are often applied retroactively and are imposed in

various types. Express Scripts provides limited information to pharmacies about how DIR fees are calculated and applied.

158. Performance-Based DIR Fees are tied to specific performance metrics set by Express Scripts. Express Scripts audits pharmacies for medication adherence rates, generic dispensing rates, and other clinical outcomes. If a pharmacy fails to meet these metrics, Express Scripts may charge higher DIR fees. This type of fee is nominally intended to incentivize pharmacies to improve their performance, but in effect it is financially burdensome, especially for pharmacies serving complex patient populations.

159. Further, Express Scripts demands that independent pharmacies agree to give it virtually unbridled audit rights. It frequently audits the pharmacies in its networks with little or no notice and often withholds significant funds on the basis of small, hyper-technical errors.

160. Fixed or Variable DIR Fees are also imposed by Express Scripts on independent pharmacies. These fees are charged by Express Scripts in fixed amounts per prescription, while others vary based on the cost of the medication or other factors. These fees can be applied uniformly or tiered based on different thresholds and performance targets. The variability and complexity of these fees can make it difficult for pharmacies to manage their finances effectively, and frequently cause retail pharmacies, especially independent pharmacies, to operate at a net loss. These fees, however, are not passed on to the consumer in the form of price reductions.

161. Rebate-Based DIR Fees are charged by Express Scripts based on the rebates they negotiate with drug manufacturers. These savings occasioned by the rebates are not passed on to the pharmacies, Plans, or the patients. Instead, the rebates contribute to Express Scripts' revenue, and the associated DIR fees are deducted from the pharmacies' reimbursements.

162. In addition to performance, variable, fixed and rebate-based fees, Express Scripts may also charge pharmacies administrative fees that cover the costs of managing pharmacy networks and processing claims. These fees can further reduce the net reimbursement that pharmacies receive, adding to their financial burden and operating losses.

163. Independent pharmacies have no choice but to accept these contract terms. Contrary to Kautzner's testimony before the House Oversight Committee, identified above, there is evidence that Express Scripts prohibited non-affiliated pharmacies from redlining and negotiating their contracts. In fact, the Committee found that Express Scripts informed the pharmacies that "rates are non-negotiable," and "[t]he rate exhibit provided offers our best and final rates."[101] Furthermore, the FTC Report found that "Independent pharmacies generally lack the leverage to negotiate terms and rates when enrolling in PBMs' pharmacy networks, and subsequently may face effectively unilateral changes in contract terms without meaningful choice and alternatives."[102]

**3. Express Scripts uses clawbacks to further financial burden independent pharmacies.**

164. The third tactic Express Scripts uses to extra supracompetitive revenue independent pharmacies is through "clawbacks." A clawback occurs when a PBM demands the return of money that has been paid, or that has been promised to be paid, to independent pharmacies after the point of sale to patients.

165. Clawbacks are typically calculated based on the total cost of the drugs dispensed or specific contractual agreements. These clawbacks are typically assessed (a) related to a specific claim; (b) on a lump-sum basis; or (c) pursuant to a BER or GER contract provision.

---

[101] Comer Letter, supra note 70, at *4.
[102] FTC Report, supra note 7.

166. Some clawbacks are attributable to a specific claim. Express Scripts pays or promises to pay a certain amount via a computer transaction that occurs when a patient appears at the pharmacy to pick up a prescription. However, Express Scripts reduces the amount to which the pharmacy is entitled for that particular adjudicated claim at some date after adjudication, either by requiring payment back from the pharmacy, or by reducing Express Scripts' next payment to the pharmacy. Clawbacks of specific claims, often occurring weeks or months later, constitute a fee that cannot be determined at the time of adjudication.

167. Other clawbacks are determined on a lump sum basis through the annual or quarterly reconciliation process. Express Scripts reduces the amount to which a pharmacy is entitled to be paid for an aggregated set of prescriptions with a variety of assessed amounts and reasons comprising a lump-sum clawback. The prescriptions, amounts, and reasons are not itemized or identified. Lump-sum clawbacks, often occurring weeks or months later, constitute a fee that cannot be determined at the time of adjudication.

168. Finally, some clawbacks are related to BER (brand name effective rate) or GER (generic effective rate) methodologies as set by Express Scripts' contracts with pharmacies.

169. A BER provision dictates that claims for branded drug reimbursement from a pharmacy or group of pharmacies will be reimbursed at an effective rate of AWP minus a stated percentage. At the end of the year, or at regular intervals, Express Scripts examines whether the pharmacy or group of pharmacies have been underpaid or overpaid relative to the BER. If the retail pharmacy or group of pharmacies has been reimbursed at an effective rate of AWP minus less than the stated percentage on brand drugs over the past year, it is deemed to have been overpaid and Express Scripts requires it to pay the difference between the amount it received and an aggregate payment of AWP minus the stated percentage in the contract.

170. Express Scripts' GER provisions operate in the same manner for generic drugs. Agreements containing BER and GER provisions may make assessments on the basis of data aggregated from numerous pharmacies and numerous payor types. For this reason, it is extremely difficult for an individual pharmacy or group of pharmacies to trace the effect of a particular provider, payor type, or claim on any amount that is ultimately clawed back by Express Scripts long after Adjudication of any of the individual claims that are rolled into the BER or GER calculation.

171. The retroactive nature of clawbacks creates financial uncertainty for pharmacies as they cannot predict their final reimbursement amounts at the time of sale. They frequently result in forcing pharmacies, especially independent pharmacies, to incur a net loss for each unit dispensed to a consumer.

172. Express Scripts does not, however, pass these recoupments on to the Plan or the consumer in the form of price reductions.

173. As is the case with respect to its rebates and fees negotiations with manufacturers, Express Scripts uses opacity and confidentiality requirements to hide its anticompetitive practices towards retail and independent pharmacies and to prevent market forces from working to correct this imbalance.

**4. Express Scripts steers patients to its own affiliated and specialty pharmacies.**

174. While Express Scripts' executives have denied that the PBM ever engaged in steering practices, there is significant evidence suggesting otherwise. In the 2024 FTC Report, the FTC stated, "PBMs may use any number of optimization levers to steer patients to affiliated specialty pharmacies, as internal documents and public comments confirm."[103]

[103] FTC Report, supra note 7.

175. According to the House Report, Express Scripts and other PBMs limit patients' abilities to choose pharmacies and steer them to their own pharmacies in four main ways: (1) preventing patients from receiving 90-day prescriptions at competing pharmacies; (2) abusing data received by the PBM to target patients with highly profitable medications; (3) only covering specialty medications if they are dispensed from a particular pharmacy (as addressed above); and (4) charging patients higher copays at competing pharmacies to incentivize patients to use the PBM-owned pharmacy.[104]

176. Express Scripts uses tactics to entice patients to use PBM-owned pharmacies for long-term maintenance medications in a variety of ways, most of which it contractually prohibits competing pharmacies from doing themselves. For example, Express Scripts may offer patients a 90-day prescription for the price of 60-days while prohibiting an independent pharmacy from offering patients the same price. The House Committee found several examples of outreach to patients in which Express Scripts and other PBMs claim to save patients money compared to an independent pharmacy, even though that independent pharmacy's copays are set by the PBM. One example of Express Scripts' patient outreach can be found below: [105]


EXPRESS SCRIPTS

Your plan is changing how you get your long-term medicine on <Effective Date>.

You're currently getting a 1-month supply of¹:

<DRUG NAME>
<DRUG NAME>
<DRUG NAME>

After <Effective Date>, you'll need to start getting the medication listed above every 3 months instead of every month to avoid paying a higher cost.

See if you could save an average of 29% with 3-month supplies compared to a 1-month supply from your local pharmacy*. A convenient 3-month supply makes it easier to stay on track with your medicine.

[104] House Report, p.*16, supra note 42.
[105] *Id.* at *16-17.

177. The Committee also found examples of outreach templates that Express Scripts used to incentivize patients to use its own pharmacies. As illustrated below, Express Scripts urged patients to move their prescriptions to Express Scripts' pharmacies by claiming to provide patients the ability to get more medicine and save money:[106]

*Figure 6: Express Scripts directing patient to Express Scripts Pharmacy*[91]



Express Scripts
P.O. Box 66537
St. Louis, MO 63166-6537

<Client Logo>

EXPRESS SCRIPTS

**Plan Member:** JOHN Q SAMPLE
**Member Number:** XXXXX
**Group Number:** XXXXXXXXXXXXXXXXX
**Plan Name:** xxxxxxxxxxxxxxxx
**Statement Period:** xx/xx/xxxx to xx/xx/xxxx

0 - 3
JOHN Q SAMPLE
CDH HRA Standard - Savings
ANYTOWN, TX 00000

<Frequency>
**Prescription Benefits Review**
for JOHN Q SAMPLE
*from Express Scripts and <Client Name>*

Talk to your doctor and you could save

**up to $33**35 quarterly

on your prescription medications.

What's Inside:
- How to start saving
- Savings Opportunity Table
- Prescription History

**Try home delivery through Express Scripts® Pharmacy.**
- Up to 90-day supply; you will pay less over time
- Free shipping right to your door
- 24/7 access to pharmacist from the privacy of your home

JOHN Q SAMPLE,
As a service to you, Express Scripts, the prescription drug benefit manager for your health plan, has prepared the below **personalized savings opportunity table** identifying lower-cost options under your plan for medications you take on an ongoing basis along with your potential quarterly savings.

**Opportunities to save on your prescription**

**Savings for JOHN Q SAMPLE**

| Medication | Days' Supply | Pharmacy | Quarterly Cost | Potential savings up to $33[35] quarterly |
|---|---|---|---|---|
| *Current Rx* | | | | |
| DICLOFENAC SODIUM / 50 mg | up to 30 | Retail Pharmacy | $44.60 | |
| *Savings Opportunity* | | | | |
| DICLOFENAC SODIUM / 50 mg | **up to 90** | Express Scripts Pharmacy | **$11.25** | |

**Pharmacy Legend:**
Express Scripts Pharmacy℠ Home Delivery (90 day supplies)
Retail Pharmacy

Make these simple adjustments and you could see savings that add up to nearly $33[35] quarterly*

**Ways you can make changes**
- Sign in at **express-scripts.com** and select the **Price a Medication** tool from the menu under **Prescriptions**
- Call Member Services at **1.800.XXX.XXXX**
- Talk with your doctor and have them e-prescribe a 90-day prescription to Express Scripts Home Delivery

178. Express Scripts could allow a competing pharmacy to offer the medication for the same or lower price and 90-days instead of 30 days and simply let the patient choose which pharmacy they want to use based on higher quality or ease of use. But Express Scripts does not do so.

179. Express Scripts not only steers patients to mail-order pharmacies, but as indicated herein, it also specifically targets patients with higher cost medications.

[106] *Id.* at p. *18.

## VIII. ANTI-COMPETITIVE EFFECTS

180. Defendants and their co-conspirators' unfair methods of competition and deceptive acts and practices harm the State of Louisiana, its patients, Plan Sponsors, and independent pharmacies.

181. Defendants' collusive conduct with Prime restrains and prevents competition for PBM services and retail pharmacy services in Louisiana and unlawfully increases their market power.

182. Defendants abuse their negotiating leverage to maximize rebates and extract even greater payments, then conceal and retain those profits for themselves instead of passing on the savings to Plan Sponsors or patients. This conduct denies Louisiana Plan Sponsors the benefits of free and unrestricted competition in the marketplace by suppressing information and transparency that would allow them to determine whether their PBM is delivering the promised savings and value, meaningful market comparisons of alternative PBM arrangements, and by fixing and increasing the prices paid by Plan Sponsors.

183. By selling formulary access and favorable placements to high price, brand-name drugs paid to Ascent, Defendants violate their contracts with Plan Sponsors and raise, rather than lower, prescription costs for both customers and consumers.

184. Defendants make rebate-oriented formulary decisions based on their own profits, denying favorable formulary placement to sometimes safer, more efficacious, or more cost-effective drugs, and denying patients the benefits of the best drug for their health and well-being.

185. Defendants cause harm to competitive pharmaceutical markets in Louisiana by destroying transparency and eliminating the proper flow of information needed for markets to operate and allocate resources efficiently.

186. Defendants' collusive conduct with Prime to align reimbursement rates and fees suppresses independent pharmacy compensation amounts by creating artificially low reimbursement rates, combined with artificially high fees.

187. Defendants limit consumers' ability to choose their pharmacies by engaging in business practices that steer patients to their own retail, mail-order, or specialty pharmacies.

188. Finally, Defendants contribute to the rapid, ongoing decline in the number of retail pharmacies across the nation (and in Louisiana) by using their newly increased market power to reduce reimbursement rates for, and steer businesses away from, unaffiliated retail pharmacies.

189. All of this harms Louisiana consumers by increasing drug prices, limiting patient choice, harming competition, and causing higher insurance premiums and costs.

## IX. CAUSES OF ACTION

### A. Count 1: Agreement in Restraint of Trade in Violation of Section I of the Sherman Antitrust Act (15 U.S.C. § 1) and the Louisiana Monopolies Act (LSA-R.S. 51:121 *et seq.*) by Defendants

190. The State realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if more fully set forth herein.

191. Between at least December 2019 and continuing until at least February 2026, Express Scripts entered into an unlawful horizontal agreement with Prime, a PBM and direct competitor, to fix the reimbursement rates and fees paid to or collected from Louisiana pharmacies.

192. Statements made by representatives of Express Scripts and Prime make it clear that they engaged in a concerted and a common scheme designed to achieve an unlawful objective, and carried out the scheme using Defendant Ascent in which they shared ownership.

193. The Express Scripts-Prime Agreement was unlawful under a *per se* mode of analysis. It was also unlawful under the rule of reason and quick look modes of analysis.

194. The Agreement allowed Express Scripts and Prime to extort larger payments from drug manufacturers, causing the List Prices for drugs to increase as manufacturers attempted to make up their losses.

195. The Agreement reduced Louisiana consumers' choice of pharmacies, the quality and convenience of pharmacy services in Louisiana, and the output of pharmacy services to Louisiana consumers.

196. The Agreement also artificially deflated reimbursement rates paid to independent pharmacies, while further artificially inflating fees extracted from Louisiana pharmacies, thereby misallocating Louisiana's economic resources.

197. Express Scripts and co-conspirator Prime, in part through their use of Defendant Ascent, were able to not only generate greater profits through the Agreement and their collective market power but also were able to conceal those profits for themselves rather than passing through the savings to Plan Sponsors and patients.

198. The Agreement did not integrate any economic functions that could plausibly create any economic efficiencies or economies of scale.

199. There were no procompetitive justifications for the Agreement; any proffered justifications, to the extent cognizable, could be achieved through less restrictive means. Any alleged procompetitive effects are substantially outweighed by the Agreement's anticompetitive effects.

200. As a direct and proximate result of the unlawful Agreement, persons in the State of Louisiana have suffered injury to business and/or property, including pharmacies who receive lower reimbursement rates for drugs they sell. They will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

201. Express Scripts, directly and through its divisions, subsidiaries, agents, and affiliates, engages in interstate commerce to adjudicate claims for prescription drugs submitted by pharmacies to Plans and in the provision of PBM services.

202. The conduct of Express Scripts in furtherance of the unlawful Agreement described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of the affairs of Defendants.

203. Ascent, directly and through its divisions, subsidiaries, agents, and affiliates, engages in interstate commerce when acting as a "rebate aggregator" who negotiates contracts, including rebates, with drug manufacturers on behalf of PBMs including its owner, Defendant Express Scripts.

204. The conduct of Ascent in furtherance of the unlawful Agreement described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of the affairs of Defendants.

**B. Count 2: Violation of the Louisiana Unfair Trade Practices Act ("LUTPA"): Deceptive Acts and Practices by Defendants.**

205. The State realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if more fully set forth herein.

206. Defendant Express Scripts engaged in one or more unfair and/or deceptive acts or practices in commerce by making material misrepresentations and omissions in violation LUTPA, LSA-R.S. 51:1405(a), including but not limited to:

a. Misrepresenting that its formulary construction lowers the cost of prescription drugs and promotes patient health;

b. Misrepresenting that the manufacturer payments it receives lower the costs of prescription drugs;

c. Misrepresenting its formulary decisions as evidence and/or value-based decisions;

d. Misrepresenting that the manner in which it classifies drugs is evidence and/or value based and is in the best interests of Plan Sponsors and patients;

e. Misrepresenting that its relationships with its mail order and specialty pharmacies lowers the cost of prescription drugs and promotes patient health;

f. Misrepresenting and concealing the reasons behind the price increases for prescription drugs;

g. Misrepresenting that its formulary preferences and exclusions are lowering prices and promoting patient health;

h. Misrepresenting the amount of "savings" that it generates for clients, patients, and the healthcare system;

i. Failing to disclose that the cost share payments consumers and Covered Individuals pay for brand-name prescription drugs are tied to inflated List Prices rather than the actual prices paid by entities in the pharmaceutical system;

j. Failing to disclose and concealing that it is excluding lower priced drugs from its formularies or using other strategies to select higher priced drugs to drive up profits;

k. Failing to disclose that it is utilizing rebate aggregators, including Defendant Ascent, to rename, obfuscate, and retain manufacturer payments;

l. Failing to disclose and concealing that it financially benefits from preferring and/or excluding certain prescription drugs on its formularies and using other strategies to select higher-priced drugs; and

m. Failing to disclose and concealing that formulary preferences and exclusions and other pharmacy plan designs are not based on the best interests of its clients and/or patients.

n. Using its dominant market power to drive up the price of prescription drugs while simultaneously excluding patients and Plan Sponsors access to lower priced drugs to maximize profits;

o. Fixing drug prices with co-conspirators;

p. Launching Defendant Ascent to fix prices, conceal payments, and increase profits for itself and its co-conspirators;

q. Forcing Louisiana's Plan Sponsors and patients to pay inflated prices through its price fixing agreement with Prime which gives Express Scripts near-complete control of the pharmaceutical pricing chain in Louisiana;

r. Coordinating and imposing unethical, unscrupulous, and exorbitantly high fees on independent pharmacies;

s. Coordinating and imposing unethical, unscrupulous, and exorbitantly low reimbursement rates paid to independent pharmacies;

t. Mandating use of its own specialty pharmacies and/or steering patients to use its own specialty pharmacies; and

u. Engaging in covert spread pricing including concealing the flow of rebate payments through the use of Defendant Ascent in order to further enrich itself at the expense of the independent pharmacies.

207. Express Scripts' misrepresentations and omissions were likely to deceive a reasonable consumer, affecting their decisions regarding drug prices and drug purchases.

208. Express Scripts representations were material because they involved health, safety, efficiency and cost, and thus are presumptively material per the FTC.[107]

209. Express Scripts' conduct is unfair under LUTPA because it is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers and not outweighed by countervailing benefits.[108]

210. Express Scripts' methods of competition and acts or practices in dealing with the independent pharmacies of Louisiana are unfair, deceptive, unscrupulous, contrary to public policy, and substantially injurious to the State, its citizens, and to the public welfare.

---

[107]Federal Trade Commission, *FTC Policy Statement on Deception* (October 14, 2023), available online at 831014deceptionstmt.pdf and followed by Louisiana Law pursuant to LAC 16:III Chapter 5(C); *see also State ex rel Guste v. Orkin Exterminating Company, Inc.,* 528 So.2d 198 (La.App. 4 Cir. 1988).

[108] Federal Trade Commission, *FTC Policy Statement on Unfairness* (December 17, 1980), available online at FTC Policy Statement on Unfairness | Federal Trade Commission and followed by Louisiana Law pursuant to LAC 16:III Chapter 5(c); *see also State ex rel Guste v. Orkin Exterminating Company, Inc.,* 528 So.2d. 198 (La.App. 4 Cir. 1988).

211. Defendant Ascent engaged in one or more unfair and/or deceptive acts or practices in commerce in violation of LUTPA, LSA-R.S. 51:1405(a), including, but not limited to:

a. Participating in the continued reclassification of payments from drug manufacturers as various fees in order to retain excess profits that would otherwise be owed back to Plans under their contracts with the PBMs owning Ascent;

b. Operating as a hub through which PBMs, including Defendant Express Scripts and its co-conspirators, can engage in horizontal per se price fixing;

c. Misrepresenting that it works to provide Plans with more competitive coverage;

d. Misrepresenting that the rebates and/or fees it negotiates with drug manufacturers lowers the price of prescription medications for Plans and patients; and

e. Misrepresenting that its formulary preferences and exclusions are lowering prices and promoting patient health

212. Ascent's misrepresentations and omissions were likely to deceive a reasonable consumer, affecting their decision regarding drug prices and drug purchases.

213. Ascents misrepresentations were material because they involved health, safety, efficiency, and cost, and thus are presumptively material per the FTC.[109]

214. Ascent's conduct is unfair under LUTPA because it is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers and not outweighed by overlaying benefits.[110]

215. Ascent's methods of competition and acts or practices in concealing profits to PBMs through reclassification and obfuscation of payments, as well as operating as a hub through which Express Scripts fixed drug prices, are unfair, deceptive, unscrupulous, contrary to public policy, and substantially injurious to the State, its citizens, and to the public welfare.

---

[109] FTC Policy Statement on Deception, supra note 107.
[110] FTC Policy Statemen on Unfairness, supra note 108.

216. Plaintiff, on behalf of itself and its citizens, seeks injunctive relief, civil penalties, restitution, and other equitable relief such as disgorgement against Defendants under LUTPA, LSA-R.S. 51:1401 *et seq.*

**C. <u>Count 3: Unjust Enrichment</u>**

217. The State realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if more fully set forth herein.

218. Alternatively, in the event the State has no remedy at law against the Defendants herein, the State maintains this action under the principles of unjust enrichment, pursuant to La. Civ. Code Art. 2298, common law, and other principles of justice.

219. As a result of the conduct described in this Complaint, Defendants have received certain funds to which they were not entitled, enriching themselves at the expense of others.

220. By their acts described in this Complaint, Defendants have been unjustly enriched at the expense of uninsured and underinsured consumers in Louisiana, as well as at the expense of Louisiana consumers whose out-of-pocket expenditures for prescription drugs are calculated based on manufacturers' List Prices or benchmarks that are higher than the net cost of the drugs.

221. Defendants are bound to compensate the consumers of Louisiana to the extent that the Defendants have been unjustly enriched.

222. The State acting as *parens patriae* is entitled to restitution equal to the amount of Defendants' unjust enrichment to redress the economic harm caused to retail pharmacies and consumers in Louisiana.

**X. <u>RELIEF REQUESTED</u>**

223. Plaintiff, the State of Louisiana, prays that this Court:

a. Adjudge and decree that Defendants violated Section I of the Sherman Act, 15 U.S.C. § 1;

b. Adjudge and decree that Defendants violated the Louisiana Monopolies Act, LSA-R.S. 51:121 *et seq.*;

c. Adjudge and decree that Defendants' conduct violated LUTPA;

d. Enjoin and restrain, pursuant to federal and state law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anticompetitive actions set forth above;

e. Issue a judgment against Defendants imposing the maximum civil penalties allowed under federal and state law, including pursuant to LSA-R.S. 51: 1407(B);

f. Issue a judgment against Defendants awarding reasonable attorneys' fees to the State, to be fixed as costs, pursuant to any applicable federal or state law, including LSA-R.S. 51:136 and 51:1409;

g. Award to the State statutory or equitable disgorgement, or any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal or state antitrust law or restore competition pursuant to LSA-R.S. 51:1408;

h. Issue a money judgment against Defendants in favor of the State and any aggrieved person in the form of restitution for any property pursuant to any federal or state law, including pursuant to La. R.S. § 51:1408(A); and

i. Such other and further relief as the Court deems just and equitable.

## XII. JURY DEMAND

224. The State prays for a trial by jury of all causes of action and pleas for relief so triable.

Dated: August 31, 2026

RESPECTFULLY SUBMITTED:

/s/ Ryan Nolan
**LIZ MURRILL**
**ATTORNEY GENERAL FOR THE STATE OF LOUISIANA**
**LOUISIANA DEPARTMENT OF JUSTICE**
John Kelley (Bar No. 35506)
Mario Guadamud (Bar No. 20458)
Ryan Nolan (Bar No. 37244)
Mike Guy (Bar No. 25406)
Public Protection Division
1885 North 3rd Street, 4th Floor
Baton Rouge, Louisiana. 70802
Telephone: (225) 326-6400
Facsimile: (225) 326-6499
kelleyj@ag.louisiana.gov
guadamudm@ag.louisiana.gov
nolanry@ag.louisiana.gov
guym@ag.louisiana.gov

**PLEASE SERVE:**

Express Scripts, Inc.
*through Registered Agent for Service of Process*

C T Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA. 70816

**PLEASE SERVE ASCENT HEALTH SERVICES, LLC VIA THE LOUISIANA LONG ARM STATUTE (LA. R.S. 13:3201-3207 *et seq.*):**

Ascent Health Services, LLC
Corporation Trust Center
1209 Orange St.
Wilmington, DE. 19801